**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**TERMINAL RAILROAD ASSOCIATION
OF ST. LOUIS, Defendant-Appellee.**

**No. 12347.**

United States Court of Appeals
Seventh Circuit.

Nov. 19, 1958.

C. M. Raemer, U. S. Atty., East St. Louis, Ill., Floyd R. Benny, I. C. C., Washington, D. C., James B. Moses, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellant.

Norman J. Gundlach, John C. Roberts, Carl W. Lee, East St. Louis, Ill., Kramer, Campbell, Costello & Wiechert, East St. Louis, Ill., of counsel.

Before DUFFY, Chief Judge, and FINNEGAN and KNOCH, Circuit Judges.

DUFFY, Chief Judge.

Two civil suits containing six causes of action were brought against defendant to recover penalties for alleged violations of the Safety Appliance Acts, Title 45 U.S.C.A. §§ 1–16, and an order of the Interstate Commerce Commission issued pursuant thereto. At issue on this appeal are the two causes of action in Civil No. 3473 and the first two causes of action in No. 3202. These four involve an interpretation of section 9, the Air Brake Provisions of the Statute.

Section 9 of the Act provides that when any train is operated with power or train brakes not less than fifty percentum of these cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and provides that the stated minimum percentage may be increased

by order of the Interstate Commerce Commission. Such an order was issued in June, 1910, increasing the percentage to 85%.

There is no dispute that defendant did not have the required percentage of air-brakes in use and operation on the movements hereinafter described. The sole question is whether the movements complained of were those of "trains." The District Court found and determined that the movements were switching operations, hence the statute had not been violated.

None of the movements in this case involves the use of main line tracks. All these movements were under the direct control of the Assistant General Yardmaster who had radio contact with all engines operated on the tracks in question. The work was accomplished by switching crews with the use of a switch engine.

The first movement complained of in No. 3202 originated in defendant's Yard No. 2, where the crew reported for work and were assigned their engine. This crew assembled cars from the No. 2 yard which were destined for No. 5 yard and for various industries to be served by that crew on that day. They proceeded to Yard No. 5 where they cut out cars which were to remain at Yard 5, and added cars destined for the industries to be serviced by the crew such as American Zinc Co., Darling & Co., Monsanto, etc. The movement of the engine and 27 cars proceeded southward along what is known as the conlogue track to a point where the conlogue is intersected by tracks of the G M & O Railway and by the Southern Railway. The distance to this point from No. 5 yard is less than 1000 feet. The movement stopped in obedience to a stop board and the operating rules of defendant. The crew checked the crossing visually and reported to the engineer that the way was clear. There were no obstructions to a clear view in any direction.

The G M & O Railway and the Southern Railway have operating rules which require all movements across this crossing to make a positive stop. Furthermore, the tracks of the Southern Railway come to a dead end approximately 1650 feet west of their crossing with the conlogue.

The movement proceeded from the crossing to a point just south of Monsanto Avenue where the movement was stopped and twelve cars were left on the south bound conlogue, and the movement proceeded to No. 2 siding where six more cars were set off, and the movement then proceeded to the siding of Darling & Company. At no time did this movement exceed ten miles per hour. The total distance of the movement was approximately 1¾ miles.

The movement set forth in the second cause of No. 3202 and the first cause of No. 3473 were identical except for the number of cars; there were 25 cars in the first instance and 37 cars in the second. Starting in Yard 5, the cars were drawn by a switch engine along the southward conlogue across the tracks of the G M & O Railway and Southern Railway as hereinbefore described. The movement proceeded to the south leg of the wye, then backed 2500 feet along the south leg of this wye and across State Highway 3, a heavily travelled highway, and then on to side tracks leading to several industrial concerns. The total distance of the movement in each case was about 1¾ miles. No cars were picked up or set out enroute. The speed was not in excess of six miles per hour and when crossing Highway 3, was reduced to three miles per hour.

The movement set forth in the second cause of No. 3473 was made in the reverse direction to those of the second cause of No. 3202 and the first cause of No. 3473. It consisted of 18 cars starting from a back track near the Monsanto plant, and proceeding to Yard No. 2. The total distance of this movement was approximately 2¾ miles. No cars were picked up or set out enroute. The speed of the movement did not exceed 6 miles per hour and was reduced to 3 miles per hour when crossing Highway 3. Protection at the Highway 3 crossing

at the time of the movements here in question was provided by automatic flashing lights and a bell. More recently, automatic gates were installed.

 A moving locomotive with cars attached is within the provision of the Act only when it is a train. There is no definition of "train" in the Safety Appliance Act. However, it has been held that where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up a train, the movement is not a train. United States v. Northern Pacific Railway Company, 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249.

The courts have been unable to give a definite all-embracing definition of "train" within the meaning of the Act. We noted in United States v. Chicago, B. & Q. R. Co., 7 Cir., 199 F.2d 223, 226: "After wrestling with it for some fifty years, courts have accomplished little other than to decide on the particular facts of the case whether the movement was that of a train within the meaning of the Act. * * * "

The most recent decisions of this Court upon the subject here under consideration are United States v. Chicago, B. & Q. R. Co., 7 Cir., 199 F.2d 223, and United States v. Elgin, J. & E. R. Co., 7 Cir., 182 F.2d 1, 2. In many respects the conditions surrounding the area where the movements of engines and cars occurred in those cases were similar to the conditions existing in the case at bar. In each of the cited cases we held the movements were switching operations and that section 9 of the Act did not apply. Although previous court decisions in this field may not be as binding as precedents in other areas of the law, we believe in the interest of consistency that the same results should be reached if the surrounding conditions are similar.

 The learned trial judge gave careful consideration to the opinions of this Court just cited as well as to numerous other opinions touching the question to be decided. The trial court

reached the conclusion that the four movements in the case at bar were switching operations. We think a correct conclusion was reached. The decision of the District Court is

Affirmed.