UNITED STATES of America, Plaintiff,

v.

CARBON COUNTY RAILWAY COMPANY, Defendant.

No. C-97-61.

United States District Court
D. Utah,
Central Division.

Nov. 29, 1961.

Wm. T. Thurman, U. S. Atty., Salt Lake City, Utah, for plaintiff.

Richard C. Davis, Washington, D. C., for Interstate Commerce Commission.

Keith E. Taylor, Salt Lake City, Utah, Parsons, Behle, Evans & Moffat, Salt Lake City, Utah, for defendant.

CHRISTENSON, District Judge.

This is an action by the United States of America for statutory penalties for the alleged failure of the defendant, Carbon County Railway Company, to make brake tests required by Sections 1 to 16 inclusive of Title 45 United States Code Annotated (particularly Sections 6 and 9 thereof as amended), and Section 132.13 (e) (1), Title 49, Code of Federal Regulations. Jurisdiction of the Court is invoked under Section 1345, Title 28 United States Code, and is not disputed.

Plaintiff claims that on January 18, 1961, the defendant railroad operated a transfer train consisting of sixty-seven (67) cars over its line of railroad from Columbia Junction, Utah, when the power brakes on each car had not been tested as required by law. In a second claim the plaintiff asserts a similar failure occurred on the same day with reference to a transfer train consisting of forty-seven (47) cars operated over its line from Horse Canyon Mine.

Defendant says that its railroad is operated wholly as a switching railroad and hence is not subject to the requirement relied upon by the Government; that the car movements of which complaint is made, constituted mere switching movements exempted from the brake test provisions; that in making the movements in question defendant did in fact comply with the test requirements as properly interpreted, assuming arguendo that these provisions were applicable, and that if the meaning and interpretation to be accorded Section 132.13(e) (1) of the Code is to require the visual inspection of the brakes of each car as contended by the Government, this requirement as applied to the operations in question would be arbitrary, unreasonable, bearing no relation to the end sought, and therefore unconstitutional.

Section 132.13(e) (1) of Code of Federal Regulations reads as follows:

"Transfer train and yard train movements not exceeding 20 miles, must have the air brake hose coupled between all cars, and after the brake system is charged to not less than 60 pounds, a 15 pound service brake pipe reduction must be made to determine that the brakes are applied on each car before releasing and proceeding."

The defendant railway company is a wholly owned subsidiary of United States Steel Corporation, and it is the owner of a railroad 11.03 miles in length. The function of the defendant railroad is to assemble and move coal shipments from the mines of the United States Steel Corporation to an interchange or switching yard at Columbia Junction, which is owned by the Denver and Rio Grande Western Railroad Company and the defendant, and the switching, return and distribution of empty cars delivered by the Denver and Rio Grande Western at the interchange.

The defendant also assembles and moves coal shipments in cars other than its own from the Book Cliff Mines to the interchange yard. The movement of Book Cliffs coal represents approximately four percent of all movements over the defendant's line, approximately all of which portion is moved in interstate commerce.

The line traverses over negligible grades a desert country uninhabited except for the town of Columbia, the population of which is approximately four hundred, and three coal mines where a total of approximately one thousand men are employed. It crosses a public highway, which serves the town of Columbia, this crossing being protected by both bell and flashing signals, and one private right of way to the coal mine at Columbia, which latter crossing is protected by stop signs standard in the State of Utah. Curves on the line vary from a maximum of twelve degrees to zero. The operation is subject to no substantial physical hazards such as falling rocks or landslides.

A typical days operation is this: defendant's crew reports for work at nine a. m., attaches two engines and a caboose against empty cars at Columbia Yard and pushes them to Columbia Mine, a distance of two miles. After putting the cars on empty tracks at Columbia Mine, the defendant's crew picks up loaded cars there, moves two miles to Columbia Yard, proceeds hence with engines and caboose three miles to Columbia Junction to pick up empty coal cars on which brakes already have been set by the Denver and Rio Grande Western when the cars were set out. The cars set out at Columbia Yard and thirty or forty additional cars are picked up in a block for Horse Canyon and Book Cliffs Mine eight miles distant, loads are picked up at these

points, moved eight miles to Columbia Yard and assembled with Columbia Mine loads previously set out and retainers set and moved three miles to Columbia Junction. In the meantime, the Denver and Rio Grande Western Railroad has set out more empty cars with brakes applied so the defendant moves the cars three miles to Columbia Yard where, if additional cars are required for Horse Canyon Mine, the defendant picks up such additional cars in Columbia Yard, moves the empty cars eight miles to Horse Canyon, picks up loads of coal there, stops in seven miles at Columbia Mine and picks up loads, moves two miles to Columbia Yard, stops and sets up retainers and proceeds three miles to Columbia Junction, returning to Columbia Yard with caboose to tie up.

A jury was impaneled to try the questions of fact thought to be involved in this case. At the close of the evidence I ruled as a matter of law that the two movements in question, one with a train of sixty-seven cars from Columbia Junction, and the other with one of forty-seven cars from Horse Canyon Mine, were train movements within the meaning of the regulation and the statute, and not merely switching operations. It was believed that the evidence in the case indicated no substantial difference from the situation before this Court in a case involving the same parties during the preceding year (C–160–59, United States of America v. Carbon County Railway Company) and that my unpublished memorandum decision in that case dated April 22, 1960, noted some of the controlling points and authorities. It was then said:

"After carefully considering the rather difficult question involved, I am of the view that the plaintiff must prevail. I do not believe that the defendant's operation, viewed in its entirety, or on a basis of the particular hauls directly involved here, can be considered no more than a switching operation, even though both before and after the hauls in question switching operations were carried on; nor do I think that its entire system could be regarded merely as a yard within which only switching operations could be conducted.

"The collection of cars referred to in the respective counts appear to have been transfer trains (United States v. Northern Pac. Ry. Co., 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249). Train movements by a carrier engaged in Interstate Commerce were involved within the contemplation of the statute. In connection with such movements a fifteen pound service brake pipe reduction was not made by defendant after the makeup of the respective trains to determine that the brakes were applied on each car before releasing and proceeding as required by Section 132.13(e) (1), Title 49, Code of Federal Regulations. Notwithstanding the respective contentions as to what actually was required in making such determination (whether by car by car check or otherwise—and I am not passing upon this point), it seems clear that in any view there was not substantial compliance with the reduction requirement if it be assumed that train movements were involved. If there could be train movements within the defendant's system, the two referred to in the complaint would be such movements. I think they were train movements.

"There being train movements involved, the degree of risk, the extra trouble that might be occasioned by the test, or other precautions equally as helpful which the defendant may have taken, do not preclude the application of the statute and the regulations. I regard United States v. Seaboard Air Line Railroad Company, 361 U.S. 78, 80 S.Ct. 124, 4 L.Ed.2d 25, controlling here, especially in view of the decision of the lower court which it reversed, 4 Cir., 258 F.2d 262. Equally or more convincing is the decision of the Seventh Circuit in United States v. Terminal Railroad Ass'n of St. Louis,

260 F.2d 884, following most of the reasoning of defendant here, but reversed without opinion by the Supreme Court in 361 U.S. 116, 80 S.Ct. 204, 4 L.Ed.2d 154. In the Terminal case actual hazards and the scope of the movements appear minimal. The lower court relied, among other cases, upon United States v. Elgin, J. & E. Ry. Co., 7 Cir., 182 F.2d 1; United States v. Chicago, Burlington & Quincy R. Co., 7 Cir., 199 F.2d 223 and various other cases cited by the defendant here. The Supreme Court's decision cannot be reconciled with defendant's interpretation of these cases, nor with the theory that in the case before me the defendant's entire operation is a switching movement and within its system there are no train movements and hence that the company is immune from application to it of the regulation under all circumstances."

A penalty was assessed in the 1960 case by reason of the defendant's failure to make the fifteen pound service brake pipe reduction required by Section 132.-13(e) (1) Title 49 Code of Federal Regulations, supra. There was not reached in that case the further question, directly involved here, whether there was required in connection with this reduction a visual inspection of the train to determine whether the brakes applied on each car. In the present case the evidence shows without dispute that the fifteen pound service brake pipe reduction was accomplished but that a visual inspection of each car to determine whether its brakes applied was not undertaken. As a matter of fact, only the brakes on the last car were visually inspected in connection with the tests involved in the respective counts.

With the thought that the regulation might fail specifically to define the steps which were required for the brake test, and in an endeavor to assure to the defendant its claimed right to a trial by jury, I submitted to a jury certain factual matters. My hope was that its answers would throw some light upon the predominantly legal but initially bothersome question of what the regulation meant. The question about which the case turned was what kind of a determination had to be made that the "brakes were applied on each car" of the train to satisfy the requirements of Section 132.13(e) (1). The purport of the jury's answers to special interrogatories was that at the time the fifteen pound service brake pipe reductions were made, it could not be determined with certainty that the brakes applied on each car without a visual inspection of the brakes by walking the train, but that without such visual inspection a determination could be made with "reasonable certainty" or with such assurance as reasonably prudent persons would be willing to act upon if their own safety were in question.

The responses of the jury were based at least in part upon evidence, which I received over the objection of the plaintiff, tending to show what inspections had been made of the cars prior to the time the trains were made up, the knowledge that the train crew had of these prior inspections and certain other inspections previously made by the Denver and Rio Grande Western Railroad Company and the train crew's inferences therefrom, and conclusions drawn by the crew from the fact that the connected brakes on the rear car (caboose) and the gauge in that car indicated that the air pressure ran throughout the train. There also was evidence received over objection that over a period of many years no malfunctioning brake had been disclosed by similar inspections on the defendant's line. No doubt the latter evidence especially carried weight with the jury in shaping its view that there was reasonable assurance that the brakes applied on each car, notwithstanding the absence of any visual inspection.

But the test requirements are not dependent upon the overall obligation of the train crews to maintain equipment in safe condition. There are other provisions in this respect which place the burden generally upon the railroad to main-

tain their train's brakes in a safe condition. To show that it has in fact maintained them in safe condition does not relieve the railroad of the obligation of making tests. These tests are a means for further assurance that periodic and regular precautions will be taken to discharge the overall duty of the railroad properly to maintain its equipment. To merge the railroad's statutory obligations to make tests with the common-law duty to use reasonable care, to substitute for required tests equally as helpful from a safety standpoint, or to draw from prior tests some reasonable assurance that required tests may be dispensed with would not be in keeping with the very purpose and nature of the regulations. and would be inconsistent with the doctrine of controlling cases. St. Louis, I. M. & S. R. Co. v. Taylor, 210 U.S. 281, 28 S.Ct. 616, 52 L.Ed. 1061; United States v. Northern Pac. Ry. Co., 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249; Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757; United States v. Seaboard Air Line Railroad Company, 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25.

Only two cases have come to my attention which directly pass upon the question of whether the "determination" contemplated by Section 132.13(e) (1) contemplates visual inspection of the brakes on each car. These are United States v. Manufacturers Railway Company, Eastern District of Missouri, 1960, 199 F. Supp. 866 and United States v. Alton & Southern Railroad, Eastern District of Illinois, 1960, 190 F.Supp. 166. Both of these cases hold directly that the requirement for visual inspection is absolute, and nothing less than literal compliance will suffice to meet the requirements of Section 132.13(e) (1).

It was plausibly argued by defendant's counsel that these cases should not be followed because they did not involve the factual recognition, as here, that a determination of the application of the brakes on each car could be made with reasonable assurance without actually walking the car to inspect the brakes; and furthermore that the cases from other jurisdictions did not come to grips with the contrasting provisions of Section 132.12 (b) (2), relating to passenger trains, which spell out expressly a brake by brake inspection and demonstrate, according to defendant's counsel, that had the Interstate Commerce Commission intended under 132.13(e) (1), to require a brake by brake inspection it would have used similar language.

On reflection I am convinced that in submitting the special interrogatories to the jury, and in overruling the government's objections to certain evidence, I embraced a theory inconsistent with the nature, purpose and requirement of the regulation and involved factual standards not helpful in its interpretation. The question is not whether a reasonable person would feel satisfied with a "determination," or whether a determination of the functioning of the brakes could be made with reasonable assurance. The question is what test is required by the regulation. The answer of the jury that the application of the brakes could be determined with reasonable assurance or reasonable certainty is not helpful because what the regulation requires involves a question of law by way of interpretation and not a finding of fact on the basis of reasonable effect or equivalence. A series of tests are required by the regulations to cover various situations and to be conducted at various times. It is not contemplated that if one test is made this will obviate the requirement for other tests on the same train or of the same brake system, even though one test reasonably may be indicative of the likelihood or "certainty" that the brakes will properly operate on other occasions. The requirements for testing, by the very nature of things, must be fixed and absolute, and not dependent upon the personal ideas of crew members as to the adequacy or effect of previous tests.

The contrasted provisions governing the inspection of brakes on passenger trains, under different circumstances upon which the defendant heavily relies, is not convincing when the entire regu-

lations are considered. The sequence of the provisions, the nature of other requirements and the purport and obvious intent of the brake regulations as a whole demonstrate that the test in question contemplates a visual inspection following the fifteen pound reduction. I also think that the specific regulation in question, giving all of its terms effect in the light of the other provisions, leads to the same result. These various provisions, insofar as they appear pertinent as background, may be abstracted as follows:

Part 132 of the regulation is entitled "Power Brakes and Draw Bars (Railroad)." The sub-heading is "Rules for Inspection, Testing, and Maintenance of Air Brake Equipment." Section 132.10 deals with general rules for locomotives. It is thereunder provided that "it must be known that air brake equipment on locomotives is in a safe and suitable condition for service." It is further provided that "foundation brake-rigging and safety supports, where used, must be maintained in a safe and suitable condition for service," and that "brake shoes must be properly applied and kept approximately in line with treads of wheels or other braking surfaces." Section 132.11, concerning train air brake system tests, says that "supervisors are jointly responsible with inspectors, enginemen and trainmen for condition of air brake and air signal equipment on motive power and cars to the extent that it is possible to detect defective equipment by required air tests." Sub-division (c) of that section expressly provides that "each train must have the air brakes in effective operating condition * * *"

Section 132.12 deals with "Initial terminal road train air brake tests." This section says that all trains must be given inspection and tests as described by paragraphs (a) to (h) of this section at various points specified in the section. (Because one test is given does not obviate the necessity of another unless specifically so provided.) Paragraph (a) requires among other things an examination for leaks and of retaining valve pipes. Paragraph (b) (1) requires various procedures, one of which is a reading of the gauge at the rear of the train, and thereafter an inspection of the train brakes to determine that angle cocks are properly positioned, that the brakes are applied on each car, that piston travel is correct, that brake rigging does not bind or foul, and that all parts of the brake equipment are properly secured. Thereafter the release signal must be given and the brakes released and each brake inspected to see that all have released. Paragraph (b) (2) with regard to passenger trains provides for a twenty pound brake application and then an inspection of the train brakes to determine if brakes are applied on each car. A release signal must be given thereafter and the brakes released and each brake inspected to see that all have been released. Sub-paragraph (e) provides that when the test of air brakes has been completed the engineman and conductor must be advised that the train is in a proper condition to proceed. Paragraph (f) says that "during standing tests, brakes must not be applied or released until proper signal is given." Paragraph (h) provides that "before adjusting piston travel or working on brake rigging, cutout cock in brake pipe branch must be closed and air reservoirs must be drained * * *"

Section 132.13 is headed "Road Train and Intermediate Terminal Train Air Brake Tests." As to passenger trains, subdivision (a) of this section provides "After recoupling, brake system must be recharged to required air pressure and before proceeding and upon receipt of proper request or signal, application and release tests of brakes on rear car must be made from locomotive in automatic brake operation." It is further provided, "Inspector or trainman must determine if brakes on rear car of train properly apply and release." (Thus there is required by specific terms the precise test which defendant claims was equivalent to the test required by 132.13(e) (1).)

So too, in 132.13(b), concerning freight trains, a reference to the caboose gauge is made.

Section 132.13(c) (1), concerning road train and intermediate terminal train air brake tests, provides: "At a point other than initial terminal where locomotive or caboose is changed, or where one or more consecutive cars are cut off from rear end or head end of train with consist otherwise remaining intact, after train brake system is charged to within 15 pounds of feed valve setting on locomotive but not less than 60 pounds as indicated at rear of freight train and on a passenger train to at least 70 pounds, a 20 pound brake pipe reduction must be made *and it must be determined that brakes on rear car apply and release properly.*" (Emphasis added.) (It cannot reasonably be maintained, it seems to me, that this latter test need not involve visual inspection of the brakes on the rear car and that the "determination" could be made from mere inference, nor does it seem reasonable that this test can be substituted for the test provided in Section 132.13(e) (1) as contended by the defendant.) Again in sub-division (2) of the same section, 132.13(c), it is said that, "Before proceeding it must be known that brake pipe pressure as indicated at rear of freight train is being restored." In sub-division (3) there is a reference to a determination that the rear brakes apply and release properly. Sub-division (d) of this section provides, among other things, that after the specified reduction, "it must be known that the brakes on each of these cars and on the rear car of train apply and release." This refers to cars added to the train. Then it is further provided that, "Cars added to train which have not been inspected in accordance with 132.12(a) to (h) must be so inspected and tested at next terminal where facilities are available * * *." In sub-division (2) (i), it is provided that at a terminal where a solid block of cars which has been previously charged and tested as provided by 132.12(a) to (h) is added to a train, the test must be made to determine that

brakes on the rear car of train apply and release.

At this point the provision involved in this case is set out as 132.13(e) (1), requiring with respect to transfer train and yard train movements not exceeding twenty miles that, "a 15 pound service brake reduction must be made to determine that the brakes are applied on each car before releasing and proceeding." (In view of the context, and the various tests under the various conditions theretofore described it seems to me clearly that a determination as to each car by visual inspection is contemplated.) Sub-division (2) of this section provides, "Transfer train and yard train movements exceeding 20 miles must have brake inspection in accordance with paragraph 132.12(a) to (h)." (Sub-divisions (a) to (h) as noted above require various procedures, going beyond a reduction of pressure and visual inspection to determine that the brakes apply on each car.)

In my judgment a consideration of the regulation as a whole leaves no doubt that it was the intention to require, with respect to transfer train and yard train movements not exceeding twenty miles, a determination when the train is made up and the fifteen pound service brake pipe reduction accomplished, that the brakes apply on each car by inspection and not merely by checking the rear car and gauge and relying upon previous tests and inspections. The "determination" in the context of the regulation is made by inspection.

If there were some ambiguity in the expression of this requirement, which I do not perceive when the act and regulations are considered as a whole, there would be clarification to the same effect by the legislative history of the act under which the regulation in question was promulgated (Senate Committee on Interstate and Foreign Commerce, Eighty-Fifth Congress, First Session, Senate Report No. 568 on Bill S1386, containing the amendment to Section 9 of the Safety Appliance Acts, known as the Power or Train Brakes Safety Appliance Act of 1958, Page 2). Therein expressed is the

general understanding that the only way "to determine" if train brakes are operative, "is by actual visual inspection of each brake after the cars are assembled in the train." U.S.Code Cong. and Adm. News 1958, p. 2345.

I conclude that it was intended by Section 132.13(e) (1), Title 49, Code of Federal Regulations, to require a fifteen pound service brake pipe reduction in order that it could and would be determined by inspection that the brakes applied on each car before releasing and proceeding; that it was not contemplated that such a determination could be made merely by inspecting the brakes on the last car of the train and noting the air gauge on that car; that the fact that other tests were required to be made previously under different circumstances did not obviate the necessity of the test in question; that such test could not be made by simply making the fifteen pound service brake pipe reduction, but that it by necessary implication in view of the language of the entire section required a determination by visual inspection that the brakes were applied on each car before such brakes were released and the train proceeded; that a consideration and review in sequence of the system of tests required by the regulations as a whole, under the varying conditions therein stated, make it clear that visual inspection as to each car was contemplated by the particular sub-section in question; that all of the language of the particular section involved could not be given effect without such an interpretation, and that the interpretation contended for by the defendant would render the section out of harmony with the other provisions of the regulation.

Defendant's final contention that the regulation, if applied to the movements in question, is unconstitutional is not supported by any authority, is negated in principle by the decisions which have considered constitutional aspects of the safety appliance act (cf. St. Louis, I. M. & S. R. Co. v. Taylor, supra), and carries little practical persuasion in view of the evidence that upon the railroad's own motion a more time consuming inspection of individual disconnected cars frequently was made immediately prior to the time of the required tests. One of the railway company's inspectors who testified himself was at a loss to say why individual car inspections were not delayed until trains were made up.

I believe I was in error in my initial view that the meaning of the regulation could some way be equated with reasonable care to involve a factual issue for the jury's determination, and I also believe that my concern over the incongruity asserted by the defendant between plaintiff's interpretation of the section in question and section 132.12(b) (2) was without substance.

The plaintiff having moved at the close of all of the evidence for a directed verdict in its favor, and this motion having been taken under advisement pending the verdict of the jury, and the Court now being of the opinion that the motion should have been granted, it is hereby directed that judgment be entered in favor of the plaintiff and against the defendant for the sum of Two Hundred Fifty Dollars ($250.00) on each of the two counts set out in the complaint, plaintiff to recover also its costs.