CARBON COUNTY RAILWAY COMPANY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 6935.

United States Court of Appeals Tenth Circuit.

Nov. 6, 1962.

Keith E. Taylor, of Parsons, Behle, Evans, Latimer & Taylor, Salt Lake City, Utah, for appellant.

William T. Thurman, U. S. Atty., Salt Lake City, Utah (Sydney Brodie, Atty., Dept. of Justice, Henry L. Hilzinger and Richard C. Davis, Attys., Interstate Commerce Commission, on the brief), for appellee.

Before MURRAH, Chief Judge, and PICKETT and HILL, Circuit Judges.

PICKETT, Circuit Judge.

Carbon County Railway Company, a Utah corporation, owns and operates a railroad in Carbon and Emery Counties, Utah, 11.03 miles in length. The principal function and use of the railroad is to assemble and move cars loaded with coal from mines to an interchange yard, where they are received by the Denver and Rio Grande Western Railroad Company for further transfer, and to receive and deliver back to the mines empty coal cars and miscellaneous loads. The United States brought this action to recover the statutory penalty for violation of the Safety Appliance Acts, ch. 196, 27 Stat. 531 and ch. 976, 32 Stat. 943, as amended, 45 U.S.C.A. §§ 1–10, specifically the Power or Train Brakes Safety Appliance Act of 1958, Pub.L. 85–375, 72 Stat. 86, and the Rules and Regulations of the Interstate Commerce Commission, 49 C.F.R. §§ 132.10–132.17 (1962 Supp.). The complaint alleged that on two occasions the defendant operated trains over its railroad "when the power or train brakes on each car in said train had not been inspected and tested as required" by the aforesaid statute and regulations. The issues in the case were whether the movements of the cars in question constituted the operation of a train within the meaning of the Act, and, if so, whether 49 C.F.R. § 132.13(e)(1) (1962 Supp.) required a visual inspection of the brakes on each car of the train to determine if they were applied. This is an appeal from a judgment in favor of the United States assessing the statutory $250 penalty for each violation.

Although there was oral testimony, the facts essential to a decision in the case are stipulated. The railroad crosses uninhabited desert country except for a small town, with a population of approximately 400, and three coal mines, at which a thousand men, more or less, are employed. There is only one public highway crossing, which serves the town, and this crossing is protected by both a flashing signal and bell. The railroad has no appreciable grades or curves. The defendant operates only one train at any particular time, and no foreign carrier operates over any of the tracks.

Loaded cars are picked up each morning from the different mines, and transferred to the railroad's yard. When they are finally assembled, the air-brake system is connected throughout the cars, including the caboose, and charged with air. The assembled cars are then moved as a unit, without further switching of the cars, to the interchange yard where the Denver and Rio Grande Western Railroad couples them into one of its trains with other loads for delivery to the consignees. Empty cars are set out by the Denver and Rio Grande Western with the air brakes operative and set. After the locomotive is attached the brake system is charged with adequate air pressure before the cars are transferred to the area of the mines, in a single unit, without further switching.[1] These cars are then set out at the mines, as needed, for loading. All movements are handled exclusively by a switch

---

1. The typical operations in a single day of the railroad's operation are described in the stipulated facts as follows:

"Defendant's crew reports for work at 9 a. m., attaches engines 1201 and 1202 and caboose against empty coal cars in Columbia Yard and pushes them to Columbia Mine, a distance of two miles. After putting cars on empty tracks at Columbia Mine, defendant's crew picks up loaded cars there, moves two miles to Columbia Yard, proceeds thence with engines and caboose three miles to Columbia Junction to pick up empty coal cars on which brakes had already been set by Denver and Rio Grande Western when the cars were set out.

"Cars set out at Columbia Yard and 30 to 40 additional cars are picked up in block for Horse Canyon and Book Cliffs

yard crew, which differs in some particulars from crews customarily handling trains over main lines. Prior to the movement of any unit of cars, loaded or unloaded, the rear brakeman observes the pressure gauge in the caboose, and visually inspects the brakes on the caboose or one of the rear cars. No visual inspection is made to determine if the brakes on each car are set. Each car is equipped with a brake system designed to operate independently of the other cars, and the fact that the brakes on one car function as they should does not establish that those on other cars will so function.[2]

The railroad contends that its operations were not "train movements" within the meaning of the statute, but merely switching operations, and further, that the Interstate Commerce Commission Regulations do not require a visual inspection of the brakes on each car before the train movement begins.

■ The purpose of the Safety Appliance Acts is to promote the safety of railroad employees, those using the facilities of the railroad, and the public. United States v. Seaboard Air Line R. R. Co., 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed. 2d 25; Baltimore & O. Ry. Co. v. Jackson, 353 U.S. 325, 77 S.Ct. 842, 1 L.Ed. 2d 862; Johnson v. Southern Pac. Co., 196 U.S. 1, 25 S.Ct. 158, 49 L.Ed. 363; Andersen v. Bingham & G. Ry., 10 Cir., 169 F.2d 328, 14 A.L.R.2d 987. To effectuate this humanitarian purpose the Act must be liberally construed. United States v. Seaboard Air Line R. R. Co.,

supra; Lilly v. Grand Truck Western R. R. Co., 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411. See Coray v. Southern Pac. Co., 335 U.S. 520, 69 S.Ct. 275, 93 L.Ed. 208; Johnson v. Southern Pac. Co., supra. Cf. Great Northern Ry. Co. v. Donaldson, 246 U.S. 121, 38 S.Ct. 230, 62 L.Ed. 616; Louisville & N. R. R. Co. v. Layton, 243 U.S. 617, 37 S.Ct. 456, 61 L.Ed. 931.

■ The Power or Train Brake Safety Appliance Act of 1958 deals with the installation, inspection, maintenance and repair of power brakes on trains. The Act directs the Interstate Commerce Commission to promulgate rules to effectuate its purposes, but neither the statute nor the regulations defines the term "train" as used therein. From the decisions, however, it is quite clear that a movement of cars by a locomotive is a train operation unless it is one of switching, i. e. the assembling, classifying and coupling of cars in a yard for the purpose of making up a train. Ordinarily after a unit is made up by the switching process, neither the distance moved, the nature of the place where it is moved, the name applied to the employees in charge, the danger and hazards incident to the particular movement, nor the fact that it is not moved on main line track, is determinative of whether it is a train. The controlling test in determining whether a movement is that of a train is the essential nature of the work performed. United States v. Seaboard Air Line R. R. Co., supra; United States v. Northern Pac. Ry. Co.,

---

Mine, 8 miles, loads are picked up at these points, moved 8 miles to Columbia Yard and assembled with Columbia Mine loads previously set out and retainers set up and moved three miles to Columbia Junction. In the meantime Denver and Rio Grande Western has set out more empty cars with brakes applied; so defendant moves cars three miles to Columbia Yard, where, if additional cars were required for Horse Canyon Mine, defendant would pick up such in Columbia Yard, move empty cars to Horse Canyon, eight miles, pick up loads there, stop at Columbia Mine, seven miles, and

pick up loads, move two miles to Columbia Yard, stop and set up retainers and proceed three miles to Columbia Junction, returning to Columbia Yard with caboose to tie up."

2. Additional facts may be found in the trial court's opinion, United States v. Carbon County Ry. Co., D.Utah, 199 F. Supp. 726.

3. In United States v. Northern Pac. Ry. Co., 254 U.S. 251, 254, 41 S.Ct. 101, 102, 65 L.Ed. 249, the Court said:
"A moving locomotive with cars attached is without the provision of the act

254 U.S. 251,[3] 41 S.Ct. 101, 65 L.Ed. 249; Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757; United States v. Chicago, B. & Q. R. R. Co., 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023. See United States v. Terminal R. R. Ass'n, 361 U.S. 116, 80 S.Ct. 204, 4 L.Ed.2d 154, reversing without opinion, 7 Cir., 260 F.2d 884. We have previously followed the decision in United States v. Seaboard Air Line R. R. Co., supra,[4] and we think that under the criteria there announced, there is no question that in the case before us trains were operated. In each instance the normal switching operations had been completed, and the essential nature of the work performed was that of transporting the cars from one location to another.

■ Section 132.13(e) (1), Title 49 C.F.R. (Supp.1962), provides:

"Transfer train and yard train movements not exceeding 20 miles, must have the air brake hose coupled between all cars, and after the brake system is charged to not less than 60 pounds, a 15 pound service brake pipe reduction must be made to determine that the brakes are applied on each car before releasing and proceeding."

The trial court held that this regulation not only requires that the brake system on a train be charged with the specified air pressure, but that after the brakes are set, and before they are released, there must be a visual inspection to determine that the brakes are applied on each car before the train is moved. We are in agreement with this conclusion. The regulation provides that the test must be accomplished in order that a determination can be made that the brakes on "each car" are functioning. This determination must be made before the brakes are released, and the train moved. Adequate air pressure in the brake system at the end of the train is not an assurance that the brakes on all the cars were applied when the brake pipe pressure was reduced. The determination required by the regulation can be made only by visual inspection of the brakes on each car of the train, and a failure to so inspect is a violation of the order.[5] United States v. Manufacturers Ry. Co., E.D.Mo., 199 F.Supp. 866; United States v. Alton & Southern R.

only when it is *not* a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains. Congress has not imposed upon courts applying the act any duty to weigh the dangers incident to particular operations; and we have no occasion to consider the special dangers incident to operating trains under the conditions here presented."

In United States v. Seaboard Air Line R. Co., 361 U.S. 78, 81–82, 80 S.Ct. 12, 15, 4 L.Ed.2d 25, the Court used this language:

"The prior decisions make clear that it is immaterial that the run was not on the main line but in a yard. The fact that switching preceded or followed these movements is likewise irrelevant to the statutory test. It may properly be said there is no 'train' in a true 'switching' operation. But when cars—at least in substantial number—are being received from consignors or delivered to consignees in an assembled unit of engine and cars that moves a substantial distance, the opera-

tion is intrinsically no different, for purposes of the Act, than a main-line haul."

4. United States v. Chicago, B. & Q. R. R. Co., 10 Cir., 280 F.2d 429.

5. The House of Representatives' report on the Power or Train Brake Safety Appliance Act of 1958, Pub.L. 85–375, 72 Stat. 86, 45 U.S.C.A. § 9, incorporates a report of the Interstate Commerce Commission, which contains this language:

"Since almost all cars are now equipped with power or train brakes, all such cars associated together must have their brakes used and operated. Inoperative train brakes associated together with operative brakes are in violation of the law. To assure compliance with the law, some method must be adopted to determine if each such brake is operative. The only way in which this determination can be made is by actual visual inspection of each brake after the cars are assembled in the train." H.R.Rep. No. 1205, 85th Cong., 1st Sess. 4 (1957).

R., E.D.Ill., 190 F.Supp. 166. Under this interpretation of the rule an absolute determination, not a reasonable determination, is required. In light of its safety record this result may well appear to the defendant in this case to be arbitrary, but nevertheless, to give meaning to the language of the rule, it is the only result which can be arrived at. As said in United States v. Seaboard Air Line R. R. Co., supra, 361 U. S. at 82, 80 S.Ct. at 15, " * * * it is not for courts to determine in particular cases whether this safety measure is or is not needed. Congress determined the policy that governs us in applying the law."

 Relying on such cases as Cramp v. Board of Pub. Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285; Champlin Ref. Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062; and Connally v. General Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322, the railroad contends that if Section 132.13 (e) (1) is to be construed as requiring visual inspection of the brakes on each car it is unconstitutional because of vagueness. There is no merit to this contention. There is nothing vague in the language of the regulation which requires the brake test "to determine that the brakes are applied on each car.[6]" Although the operators of the train might be reasonably satisfied that the brakes were applied on each car, the record is clear that the only method by which it can be determined that the brakes are properly applying on each car of a train is to look at them individually after they are set by the engineer and before they are released.

Affirmed.

6. In Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L. Ed. 322, the Court said:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."