**Robert F. GROTHUSEN**

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, a/k/a Amtrak.**

Civ. A. No. 80–2902.

United States District Court,
E.D. Pennsylvania.

March 5, 1984.

Albert M. Hankin, Meyer, Lasch, Hankin & Poul, Philadelphia, Pa., for plaintiff.

Richard L. Goerwitz, Jr., Swartz, Campbell & Detweiler, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Robert Grothusen was injured while working as a railroad lineman for National Railroad Passenger Corporation (Amtrak). Grothusen then brought this action pursuant to the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., against Amtrak alleging that the defendant was liable for failing to provide him with a safe place to work. The case was tried to a jury which returned a verdict in favor of the defendant. Presently before me are plaintiff's motions to set aside the verdict and for a new trial. For the reasons that follow, these motions will be denied.

On February 17, 1979, Grothusen had been assigned to a converted passenger car which was being used as a work car by Amtrak employees to perform emergency repairs upon the tracks. Each end of this car contained two sets of stairs that were used for boarding and alighting from the car. Along the left set of stairs on ·the front of the car was a curved handrail. As one descended this set of stairs, the railing was on the lefthand side, but not on the righthand side.[1] At the end of the day, Grothusen was exiting from the front of the car down the left set of stairs. As he was descending, Grothusen slipped on some snow that had accumulated on the stairs. He fell to the ground and allegedly injured his back as a result.

At trial, plaintiff testified extensively about his injuries and the treatment he had received, including traction, a myelogram, and various pain treatments. *See* Tr. 1–58 to 81. He stated that the effects of the accident continued to the time of trial with persistent pain radiating from his lower back down to his legs. Tr. 1–81. In addition, he stated that he was unable to lift in excess of ten pounds without experiencing discomfort and could not bend at all. Tr. 1–81; 1–89. He further testified that he walked in constant pain. Tr. 1–89. Plaintiff's movements and postures in court corroborated this testimony. When called to the witness stand to testify, plaintiff exhibited a pronounced limp and sat in apparent discomfort.

Unfortunately for the plaintiff, the defendant offered into evidence a surveillance movie of him that had been taken one day before trial began. This film was decidedly at odds with plaintiff's testimony. The film showed Grothusen walking to and from his car carrying parcels with no apparent difficulty. *See* Tr. 3–55. The noticeable limp that he demonstrated in court, which he testified as being a "constant thing", Tr. 1–89, was absent. The film also showed the plaintiff bending over, an activ-

---

**1.** In contrast, each set of stairs in the rear of the car had curved handrails on both sides of the stairs. *See* Tr. 1–140.

ity he had earlier testified he could no longer perform. Tr. 1–81. Finally, it depicted Grothusen carrying his twenty-one month old son without difficulty, even though he had previously stated he could lift only 5–10 pounds without discomfort. Tr. 1–89. After reviewing the film outside the jury's presence, and hearing extensive cross-examination regarding the circumstances that surrounded its making, I admitted the movie in evidence and allowed the jury to view it.

The plaintiff then sought a continuance of the trial to attempt to gather evidence to rebut the film. Counsel contended that because of the short notice he had been given regarding the existence of the film,[2] additional time was needed in order to determine if the film had been altered in any way and to locate rebuttal witnesses. Tr. 4–14 to 20. I refused this request for a continuance, but instead permitted plaintiff to have the film examined by his expert after trial to assess its authenticity.[3] In addition, I allowed plaintiff to be recalled in an attempt to rebut the events that had been shown to the jury.

2. As previously mentioned, the film was made on the day before trial began, Sunday, September 19, 1982. On the first day of trial, defendant's counsel informed counsel for the plaintiff of the film's existence, but because the film had not yet been developed, he stated that he had not yet decided whether he would use it. The film was developed and became available on Wednesday, September 22, 1982, and was shown to plaintiff's counsel at the luncheon recess on that day. *See* Tr. 3–49.

3. While the results of this subsequent examination have not been brought to my attention, I can only conclude that plaintiff's conspicuous silence in this regard to mean he has no evidence that the film was other than an accurate representation of the events that transpired.

4. 45 U.S.C. § 4 states in part: "[I]t shall be unlawful for any railroad company to use any car … that is not provided with secure grab irons or handholds in the ends and sides of each car…." Where an employee relies upon a violation of the SAA in his FELA claim, he is required only to prove the statutory violation and is therefore relieved of the burden of proving negligence. The injured employee need not establish common-law proximate causation, but only that his injury resulted in whole or in part

In his post-trial motions, plaintiff seeks relief on essentially three grounds. First, he contends that I erred in failing to instruct the jury regarding the effect of the defendant's alleged violation of the Federal Safety Appliance Act (SAA), 45 U.S.C. § 1 *et seq.*[4] Plaintiff contends that the SAA was violated on account of the defendant's removal of one of the curved handrails from the side of the steps of the railcar. The removal of this curved handrail was allegedly the cause of plaintiff's injuries because he contends that he reached for this missing railing as he began to fall. If this railing had been present, plaintiff asserts that he would not have been injured. Tr. 1–101.

I refused to adopt plaintiff's proffered instructions regarding the SAA because, in my view, the plaintiff had not established that the act had been violated.[5] The parties agreed that the regulation regarding the proper number and placement of handholds for the railcar at issue is section 231.12 of the Federal Railroad Administration manual, "United States Safety Appliance Standards and Power Brake Requirements."[6] Manifestly, this regulation

from the railroad's violation of the SAA. The defenses of contributory negligence and assumption of the risk are not available to the railroad. *Crane v. Cedar Rapids & Iowa City Railway Co.*, 395 U.S. 164, 166, 89 S.Ct. 1706, 1708, 23 L.Ed.2d 176 (1969).

5. Plaintiff's argument that I erroneously decided an issue that should have been resolved by the jury is without merit. Because this involves an interpretation of the regulations, the issue of whether the facts as presented constitute a violation of the SAA is a question of law for the court to decide. *See United States v. Seaboard Coast Line Railroad Company*, 368 F.Supp. 1079, 1083 (M.D.Fla.1973). Only after this legal hurdle is resolved is it appropriate for the jury to decide whether the plaintiff's injuries resulted in whole or in part from the statutory violation.

6. This section states in pertinent part:
   § 231.12 Passenger-train cars with wide vestibules.
   *   *   *   *   *   *
   (b) Side handholds—(1) Number. Eight.
   (2) Dimensions. Minimum diameter, five-eighths of an inch, metal. Minimum clear length, 16 inches. Minimum clearance, 1¼, preferably 1½ inches.

does not contain any provisions regarding curved handrails leading down the steps. Nonetheless, plaintiff argues that having originally installed such rails, the defendant violated the act by removing one of them. I find this argument to be unpersuasive. By placing these rails upon the car Amtrak took action that is beyond what is required by the SAA. To impose liability upon defendant when one of these extra measures is later removed would in practical effect deter railroads from ever taking safety actions beyond the minimum requirements of the SAA, thereby creating a greater risk for the employees. Such a result would be anomalous in light of the purpose behind this act, which is to promote the safety of railroad employees. *See Carbon County Railway Co. v. United States,* 309 F.2d 938 (10th Cir.1962).

The cases relied upon by plaintiff either do not support his position or are inapposite to the issue of whether the absence of a safety appliance which is not required by the SAA constitutes a violation of this act when it is removed. For example, in *Shields v. Atlantic Coast Line Railroad Co.,* 350 U.S. 318, 76 S.Ct. 386, 100 L.Ed. 364 (1956), the plaintiff was injured when a running board upon which he was standing broke and caused him to fall. The Court held that although the running board was not specifically required by the SAA, it nonetheless constituted a safety appliance for the purposes of the act. Therefore, liability for violating the SAA was proper because once the railroad undertook to provide this board, it had a duty to ensure that the appliance was safe and secure, as required by the SAA. *Id.* at 322–24, 76 S.Ct. at 390–91. In contrast, in the present case the plaintiff was not injured because of an unsecure or unsafe handrail, but rather as a result of the absence of such a device. Obviously, if Grothusen had fallen after one of the curved handrails had broken or snapped, *Shields* would require a conclusion that a violation of the SAA had occurred. *See also Blazin v. Southern Pacific Co.,* 127 F.Supp. 20 (N.D.Cal.1954); *Thomas v. Kansas City Southern Railway Co.,* 305 S.W.2d 642 (Tex.Civ.App. 1957), *cert. denied,* 356 U.S. 959, 78 S.Ct. 995, 2 L.Ed.2d 1066 (1958). However, because of this critical factual distinction, it was proper not to instruct the jury regarding the effect of the SAA.

■ Plaintiff's second ground for a new trial is that I erred in refusing his requested jury instruction no. 14 that "the defendant was negligent in this case and ... such negligence contributed in whole or in part to the plaintiff's injury." The plaintiff contends that this charge was proper in light of the evidence that the plaintiff had slipped on the snow that had accumulated on the steps of the work car. This argument is without merit. It was the duty of the jury to decide whether the defendant was negligent in failing to remove this snow. There was no error in refusing this instruction.

Plaintiff's final argument is that a new trial is necessary because of the "atmosphere" in the courtroom that was allegedly prejudicial to him. He objects primarily to my refusal to grant a continuance after the defendant had screened the surveillance movie. Plaintiff also challenges the fact that I permitted a court appointed medical expert, Richard H. Rothman, M.D.,

(3) Location. Vertical, one on each vestibule door post.

(4) Manner of application. Side handholds shall be securely fastened with bolts, rivets, or screws.

(c) End handholds—(1) Number. Four.

(2) Dimensions. (i) Minimum diameter, five-eighths of an inch, wrought iron or steel. Minimum clear length, 16 inches. Minimum clearance, 2, preferably 2½ inches.

(3) Location. Horizontal, one near each side on each end projecting downward from face of vestibule end sill. Clearance of outer end of handhold shall be not more than 16 inches from side of car.

(4) Manner of application. End handholds shall be securely fastened with bolts or rivets. When marker sockets or brackets are located so that they can not be conveniently reached from platforms, suitable steps and handholds shall be provided for men to reach such sockets or brackets.

*See* Tr. 4–13.

**490**

to testify that he had been appointed by me to serve as impartial examiner.

 With respect to the refusal to grant a continuance of the trial, this is a matter within my discretion, *see Concerned Citizens of Bushkill Township v. Costle,* 592 F.2d 164, 172 (3d Cir.1979), which I am convinced was not abused in this instance. The grounds advanced by plaintiff in support of his request were that additional time was needed to examine the film to determine if it had been altered and to locate rebuttal witnesses. In order to balance plaintiff's interest in examining this film with the legitimate interest of the court and the jurors in completing the trial, I permitted this examination to take place after trial. Obviously, this examination produced no evidence favorable to plaintiff. *See supra* n. 3. I attempted to strike a similar balance with regard to the rebuttal witnesses by permitting plaintiff to be called back to the stand in order to explain the circumstances surrounding the events that were filmed.[7] Because these matters had already been testified to by the best available witness, any additional testimony would have been cumulative. Therefore, plaintiff was not prejudiced by my refusal to grant a continuance.

Finally, the testimony of Dr. Rothman that he was an impartial expert appointed by the court was not improper. Rule 706(c) of the Federal Rules of Evidence states, "In the exercise of its discretion, the court may authorize disclosure to the jury of the fact that the court appointed the expert witness." In light of the disputed issue of damages in the present case, it was not an abuse of my discretion to permit this information to be disclosed to the jury.

### ORDER

AND NOW, this 5th day of March, 1984, for the reasons set forth in the foregoing memorandum, the plaintiff's motions to set aside the verdict and for a new trial are hereby denied.

---

**7.** In addition, I permitted one of plaintiff's neighbors to testify regarding the fact that the movie operator had not spoken to him about the plaintiff on the day the film was made.