## UNITED STATES *v.* SEABOARD AIR LINE RAILROAD CO.

No. 10.   Argued October 19, 1959.—Decided November 9, 1959.

*John F. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg* and *J. F. Bishop.*

*Eppa Hunton IV* argued the cause for respondent. With him on the brief was *Lewis Thomas Booker.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit for statutory penalties, instituted by the United States, charging respondent with the operation of four trains in violation of the Safety Appliance Act, 27 Stat. 531, as amended, 32 Stat. 943, 45 U. S. C. §§ 1, 6, 9. That Act requires every "train" moving in interstate traffic [1] to have power brakes on not less than 50% of

---

[1] Section 1 provides, in relevant part:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with . . . appliances for oper-

the cars (§§ 1, 9)—a requirement which the Interstate Commerce Commission by regulation has increased to 85%. 49 CFR § 132.1. The penalties are $100 for each violation.[2] § 6.

The District Court rendered judgment for respondent and the Court of Appeals affirmed by a divided vote. 258 F. 2d 262. We granted the petition for a writ of certiorari because of the seeming conflict between that ruling and our prior decisions. 358 U. S. 926.

Respondent has a "classification or assembly yard" in Hopewell, Virginia. Trains to and from Hopewell use it for breaking up incoming trains and for assembling cars into outgoing trains. A track extends from this "classification" yard for about two miles through the city. In this stretch the tracks make an interchange connection with another railroad and cross, *at grade,* five streets, two private roads and four tracks of another railroad. Nine spur tracks branch off these tracks to industrial sidings. About two miles from the "classification" yard are plants of the Allied Chemical & Dye Company and Continental Can Company.

The complaint charged four violations: First, moving a locomotive and 26 cars as a single unit, without stops, from the track of Allied Chemical to the "classification" yard. Second, moving a locomotive and 28 cars as a single unit, without stops, from the "classification" yard to the track of Allied Chemical. Third, moving a locomotive and 29 cars as a single unit, without stops, from a track near Allied Chemical for about a mile to the interchange

---

ating the train-brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose."

[2] The statute was amended August 14, 1957, to increase the penalty to $250 (71 Stat. 352, 45 U. S. C. (Supp. V) § 6).

track where the locomotive was detached, coupled to 20 additional cars, and then recoupled to the 29 cars. The 49 cars were then hauled, without stops, for about a mile to the "classification" yard. Fourth, moving a locomotive and 23 cars as a single unit, without stops, from the "classification" yard to the track of Continental Can.[3]

The meaning of the word "train" as used in the Act has been before the Court four times. In *United States v. Erie R. Co.*, 237 U. S. 402, it was recognized that while "switching operations" were not "train" movements within the meaning of the Act, the movement of cars from one yard to another yard of the same carrier was covered. It was emphasized that this movement, like other main-line movements, took the cars over switches and other tracks where the traffic was exposed to the hazards against which the Act was designed to afford protection. The same result was reached in *United States v. Chicago, B. & Q. R. Co.*, 237 U. S. 410, where the movements were of transfer trains, shifting cars from one yard in Kansas City to another on the opposite side of the Missouri River. It was again emphasized that this was "not shifting cars about in a yard or on isolated tracks devoted to switching operations," but moving traffic over a line where there were great hazards in the operation. *Id.*, at 412. *Louisville & J. Bridge Co. v. United States*, 249 U. S. 534, involved movements of cars for about three-quarters of a mile from one company's terminal to that of another, the cars passing over city streets, at grade, and along and over other tracks. The Court, in holding that these movements

---

[3] Respondent since 1951 had used air brakes on the cars in these movements after inspectors of the Interstate Commerce Commission had advised that it was necessary to do so. But it discontinued the practice in 1956, justifying the discontinuance on the ground that switching movements were involved, that the use of air brakes caused a delay of about 40 minutes in each movement, and that the increased annual cost for the use of air brakes was $30,000.

were covered by the Act, emphasized that this was not "a sorting, or selecting, or classifying" of cars "involving coupling and uncoupling, and the movement of one or a few at a time for short distances," but an operation involving the typical hazards which gave rise to the need for the Act. *Id.*, at 538. *United States v. Northern Pacific R. Co.*, 254 U. S. 251, involved so-called transfer trains running between points, four miles apart, within one yard. The railroad contended that the Act did not apply because the movement was within a yard and because no through or local trains moved over these tracks. The tracks did cross streets and other tracks at grade; and the trains were run without stops the four miles. It was held that these movements were covered by the Act. "A moving locomotive with cars attached is without the provision of the act only when it is *not* a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains." *Id.*, at 254–255.

We think this case, judged by the principles announced in the earlier four, was erroneously decided.

The end of each trip was characteristic of the usual freight run: cars were either received from a consignor or delivered to the consignee. This was not "sorting, or selecting, or classifying" cars "involving coupling and uncoupling, and the movement of one or a few at a time for short distances" (*Louisville & J. Bridge Co. v. United States, supra,* at 538) nor any other type of movement that is comparable to "switching." In three of the movements there was a run of two miles without stops. In one, there was one stop to pick up additional cars; but a mile run preceded that stop and another mile of uninterrupted travel followed it. The prior decisions make clear that it is immaterial that the run was not on the main line but in a yard. The fact that switching preceded or followed these movements is likewise irrelevant to the statu-

tory test. It may properly be said there is no "train" in a true "switching" operation. But when cars—at least in substantial number—are being received from consignors or delivered to consignees in an assembled unit of engine and cars that moves a substantial distance, the operation is intrinsically no different, for purposes of the Act, than a main-line haul.

The District Court found that "The movements complained of would not have been less hazardous to employees or the public if air brakes had been coupled and used." Yet it is not for courts to determine in particular cases whether this safety measure is or is not needed. Congress determined the policy that governs us in applying the law. Traditionally, movements of assembled cars for substantial distances involved the hazards of crossing public highways and the tracks of other lines with attendant risks to the public. More important, they involved risks to those who ride the trains,[4] particularly the men who operate them. History showed that hundreds of workers had been injured or killed by the stopping of unbraked cars, by the operation of hand brakes, and by the use of hand couplers. This history, well known to Congress,[5] was the primary purpose behind

___

[4] The title of the original Act described it as "An Act to promote the safety of employees and travelers upon railroads . . ." etc. 27 Stat. 531.

[5] See H. R. Rep. No. 1678, 52d Cong., 1st Sess., p. 3, where it is noted that for the years 1889 and 1890 "38 per cent of the total number of deaths and 46 per cent of the total number of injuries sustained by railway employés resulted while coupling cars or setting brakes."

On page 7 of a report of a subcommittee submitted as a part of S. Rep. No. 1930, 57th Cong., 1st Sess., the following statement of a witness appearing before the subcommittee was made:

"If only a portion of the equipped cars are operated, trainmen are exposed to great danger arising from the breakage of an air hose, or a coupling between the cars so braked, which causes an instantane-

the legislation. The Act, therefore, should be liberally construed as a safety measure. Movements which, though miniature when compared with main-line hauls, have the characteristics of the customary "train" movement and its attendant risks are to be included.

*Reversed.*

---

ous and extremely powerful application of the power brakes, which causes the front cars in the train to quickly slacken speed and stop, and the other cars behind them, which are not braked, to rush forward against them, thus causing a severe shock, which often wrecks the train and jars the trainmen off and injures them, and in some cases they fall under the wheels and are killed. If the brakes on all of the cars were operated this would not be so, for the brakes would be applied equally all over the train, and the cars on the rear end would slacken their speed just as quickly as those on the front end, and thus prevent their running forward against the front cars and producing the shock just described. There is no way for trainmen to escape these injuries; for they are still required by the companies to ride out on the tops of trains, and when one of these shocks comes, it comes to them without warning, for the noise of the running train, together with darkness at night, prevents them from detecting any trouble ahead.

"Wrecks caused in this way do not only cause injury to the trainmen on the train which is wrecked, but also on double-tracked roads the opposite track is immediately blocked with wrecked cars, thus endangering not only the lives and limbs of trainmen, but passengers as well, who may be on trains approaching on the opposite track, which can not be stopped before striking the obstruction. I personally know of several bad wrecks of this character myself."