**Richard D. DiFRISCHIA**

v.

**NEW YORK CENTRAL RAILROAD COMPANY, a Corporation, Appellant.**

**No. 13721.**

United States Court of Appeals Third Circuit.

Argued Jan. 12, 1962.

Filed Aug. 28, 1962.

As Amended Oct. 4, 1962.

James R. Orr, Pittsburgh, Pa., (Ernest R. Dell, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellant.

Paul E. Moses, Pittsburgh, Pa., (Robert B. Ivory, Evans, Ivory & Evans, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and HASTIE and GANEY, Circuit Judges.

J. CULLEN GANEY, Circuit Judge.

Appellee was injured in a railroad crossing accident on Route 7, approximately one-half mile south of Middleport, Meigs County, Ohio, on January 4, 1957. He recovered a verdict in the United States District Court for the Western District of Pennsylvania against the appellant railroad.

The railroad claims that the trial court erred in charging the jury that if they found that it violated the Safety Appliance Acts (45 U.S.C.A. §§ 1–9) and the rules of the Interstate Commerce Commission, which together require that a "train" shall not be operated without having air brakes functioning in at least 85% of the cars being moved, they should find the railroad negligent. The section of the Safety Appliance Acts requiring power brakes contains no exceptions. However, court decisions have stated that switching, classifying and assembling cars within railroad yards for the purpose of making up trains, and the movement of a few cars at a time for short distances, involving coupling and uncoupling, are not train movements. United States v. Northern Pacific Ry. Co., 254 U. S. 251, 41 S.Ct. 101, 65 L.Ed. 249 (1920); United States v. Seaboard Air Line R.R. Co., 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959). Nevertheless, movements "which, though miniature when compared with main-line hauls, have the characteristics of the customary 'train' movements and its attendant risks are to be included." United States v. Seaboard Air Line R.R. Co., supra, at p. 83, 80 S.Ct. at p. 16. In the case before us, a string of loaded freight cars was stationed on track No. 13 in the railroad's yard. The thirty-seventh car in the string was destined for the repair shop and was so marked. The string of cars was uncoupled after the marked car. The air hose on the remaining 36 cars was left unbroken but was not attached to the diesel engine equipped to handle air brakes. A single connection between the engine and the first of the 37 cars would have permitted the use of air in the air line for all but the disabled car. To put the disabled car on the shop repair track ¼ of a mile away, that car had to be drawn with the 36 others on to the main track past a switch, then pushed back on to another track at the switch, and then "kicked" on to the shop repair track. After this operation the remaining 36 cars would be drawn back and placed in their original position on track No. 13. Because of the length of 37 cars, it was necessary for the engine to cross Route 7 in order to get the cars off or on track No. 13. The crossing of Route 7 could have been obviated in this operation if a lesser number of cars were drawn, but it would have required more time to complete the movement. According to a survey made by appellant in May of 1955, 278 passenger cars and 60 trucks traversed the railroad crossings on Route 7 between 6 and 7 o'clock in the morning. Under these circumstances, the trial court correctly ruled that the engine and 37 cars were a "train" within the meaning of the Safety Appliance Acts. See Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757 (1919). The fact that switching operations preceded or followed the movements

will not remove it from the statutory requirements. United States v. Seaboard Air Line R.R. Co., supra, 361 U.S. at pp. 81–82, 80 S.Ct. 12.

 Not content with establishing that the hose which carried the air for the freight car brakes was not hooked up to the engine, and obtaining an admission from the engineer that he was not looking in the direction the train was traveling between the time it entered the crossing area and the moment of collision, plaintiff offered evidence to show that the crossing was extra hazardous or unusually dangerous and that defendant knew this fact. In this connection, the trial court, over defendant's objections, permitted plaintiff's counsel to read to the jury defendant's answers to interrogatories and request for admissions. These answers and admissions gave information concerning eight collisions between motor vehicles and defendant's trains at the crossing during the hours of darkness between August 11, 1950, and September 17, 1956, four of which occurred while the train was standing on the crossing. Also over defendant's objection, plaintiff's counsel was allowed to read to the jury, from the deposition of the Prosecuting Attorney of Meigs County, questions and answers as to the number of vehicle accidents occurring at the crossing from 1950 to 1955 during the hours of darkness. The deposition listed fourteen accidents from November 24, 1950, to November 10, 1955, and gave the times and dates of the accidents and the drivers' names. The list contained no other explanation. The trial judge instructed the jury that the information concerning the accidents was permitted to be introduced solely for the purpose of showing that the railroad had notice of the nature of the crossing, and not to show negligence on the part of the railroad. In Ohio, unless the crossing is unusually hazardous, a railroad need comply only with the statutory provisions and the orders of the Public Utility Commission regarding warning signs or signals. A crossing is unusually hazardous if there is substantial risk that a driver in the exercise of ordinary care may be unable to avoid collision with a train operated over the crossing in compliance with statutory requirements. Hood v. N. Y., Chicago & St. Louis R. Co., 166 Ohio St. 529, 144 N.E.2d 104 (1957). In Pennsylvania, under some circumstances where the cause of the accident or the defective or dangerous condition is unknown or disputed, evidence of the occurrence of similar accidents is admissible, in the sound discretion of the trial judge, for the purpose of establishing (1) the character of the place where they occurred, (2) their cause, (3) the imputation of notice to the owner of the place where they occurred, and (4) the likelihood of injury. Stormer v. Alberts Construction Co., 401 Pa. 461, 466, 165 A.2d 87 (1960); Yoffee v. Pa. Power & Light Co., 385 Pa. 520, 542–543, 123 A. 2d 636 (1956); Fisher v. Pomeroy's, Inc., 322 Pa. 389, 185 A. 296 (1936); Ringelheim v. Fidelity Trust Co., 330 Pa. 69, 71, 198 A. 628 (1938). "Knowledge of the likelihood of injury is imparted by information of like occurrences under similar circumstances, and is a fact to be considered by the jury in determining whether proper precautions were taken. Hollis v. U. S. Glass Co., 226 Pa. 332, 75 A. 409." Muller v. Kirschbaum Co., 298 Pa. 560, 566, 148 A. 851, 853 (1930). In the case before us, each of the accidents was not shown to be like the one in question; although it was shown to have taken place in the hours of darkness. Therefore, the trial court was acting within its sound discretion in permitting evidence of the prior accidents to be presented to the jury for the limited purpose of establishing the character of the crossing and notice of it by the defendant.

The railroad also contends that the trial court should have ruled that plaintiff was contributorily negligent. An answer to this contention, we think, requires more than a brief statement of the evidence. Two sets of tracks, owned by the railroad, intersect Route 7, a two-way concrete highway, at approximately right angles. The crossings are at grade.

The tracks at this point are approximately 75 feet apart. To a motorist traveling in a westerly direction in this vicinity, Route 7 curves slightly to the left in a wide arc.[1] About 375 feet east of the first set of tracks is a circular metal sign bearing a black cross and the letters "RR" to warn motorists that they are approaching a railroad crossing. Approximately 20 feet east of the first set of tracks and 15 feet to the right or northern edge of Route 7 is a wooden pole with white crossarms bearing the words "railroad crossing" in black letters. Beneath the crossarms is a black sign with the notation "2 Tracks" in white letters.

A sodium vapor lamp, installed and maintained by the railroad, hangs 25 feet above the ground from the arm of a pole situated 14 feet east of the first track and 10 feet north of the highway. When lit, this lamp casts a yellow light. This lamp is not very effective for it illuminates only a small area directly beneath. At night, particularly when it is raining, snowing or foggy, the light hinders rather than benefits motorists as to the position of a train on or approaching the crossing. Even when such adverse weather conditions are not present, as a conductor of the railroad put it, the light was such that a motorist could "sneak right up" on railroad cars on the crossing without knowing they were there.[2] As for approaching trains at night, the rays of the headlight blended with those of the sodium vapor lamp. As a safety measure, because of the deceptive lighting at this crossing, a member of the train crew was required by the railroad to drop a lighted flare to the left side of the track facing the direction in which the train was going when the engine approached the crossing, and to repeat the dropping of a flare on the other side of the track after the train had traversed the highway.

There is no sign, signal or light on either side of the highway between the two sets of tracks to indicate the presence and location of the second set of tracks. The second or more westerly set of tracks was a main line, and there was no curve or fixed object to obstruct a motorist's view of that track for a distance of at least 200 feet to the south of the highway. The pattern of the railroad crossing signs and the sodium vapor light described was duplicated on the other side or southern edge of the highway for motorists driving in the opposite or eastwardly direction on Route 7.

At about 6:45 on the morning of January 4, 1957, while it was yet dark, plaintiff was operating a tractor and trailer loaded with steel wire in a westerly direction on Route 7 where it crosses the railroad's double set of tracks. It was cold and partly foggy. The tractor and trailer weighed over 28 tons. When plaintiff reached the circular sign, he reduced his speed and lowered the window on his left side to shoulder level so that he could hear the sound of any approaching train. The headlights of the tractor were on high beam, and the windshield wipers were in use. As he approached the first set of tracks he reduced his speed to between 15 and 20 miles per hour. After he crossed the first set of tracks without mishap, he was in doubt as to where the second set was located and was on the lookout for it, believing that it would be but a few feet away from the first. He observed the second sodium vapor light on the other side of the highway, but he did not hear the sound or see the beam of light of any approaching train. When he was within 20 feet of the second set of tracks, he saw a flash of red light to his left. The red light came from a flare that had been thrown from the engine as a warning to motorists traveling in an eastwardly direction on Route 7, warning of the engine's presence. When the tractor-trailer reached the second set of

1. The directions are taken from notations on photographs, used as exhibits at the trial.

2. In 1954 and 1955, there were four accidents in which a vehicle collided with a train while it was standing on the tracks at this crossing.

tracks, it collided with the right front corner of the drab-colored engine going in a northerly direction (or from the plaintiff's left) and drawing the 37 freight cars at a speed of about 3 miles an hour. After the collision, the engine moved about two freight car lengths, dragging or pushing the tractor-trailer with it before stopping. Plaintiff made no attempt to stop his vehicle prior to the collision because he was unaware that the engine was on the crossing. The engineer did not apply the brakes of the engine until immediately after the impact because prior thereto he was not looking in the direction in which the engine was moving.

Under Ohio law, the contributory negligence of a plaintiff is a complete bar to his recovery. Patton v. Pennsylvania R. Co., 136 Ohio St. 159, 24 N.E.2d 597 (1939); Walker v. Baltimore & Ohio R. Co., 84 Ohio App. 221, 85 N.E.2d 413 (1948). Plaintiff concedes that in the absence of circumstances excusing his failure to have seen an approaching train, one who drives upon a railroad crossing and is struck by a train is guilty of contributory negligence as a matter of law. Thus where special conditions are shown which can prevent a driver from being aware of the approaching train, the question of contributory negligence is for the jury.

The railroad claims that plaintiff should have been aware of the presence of the train in time to have stopped his vehicle. Plaintiff was not required to stop his vehicle unless his looking or listening disclosed the presence of a moving train. Robinson v. Pennsylvania R. Co., 117 Ohio St. 43, 158 N.E. 83, 88 (1927). His excuse for not stopping was twofold. First, he did not know where the second set of tracks was and, therefore, had to concentrate on determining its location. If he had been adequately warned of its approximate position, he might have been expected to see the red flare sooner than he did and thus be aware of the presence of a train moving at right angles to the direction he

was going. And second, the sodium vapor lamp, under the weather conditions then prevailing, acted as a veil for approaching trains rather than disclosing their presence. Under those circumstances, we think the trial court was correct in leaving the question of plaintiff's contributory negligence to the jury to decide.

The judgment will be affirmed.