UNITED STATES of America,
Plaintiff,

v.

SOUTHERN RAILWAY COMPANY,
Defendant.

Civ. No. 2185.

United States District Court
W. D. North Carolina,
Asheville Division.

Heard Jan. 31, 1964.

Decided Feb. 24, 1964.

William Medford, U. S. Atty., Asheville, N. C., and Henry L. Helzinger and J. Thomas Murphy, Attys., Interstate Commerce Commission, Washington, D. C., for plaintiff.

George H. Ward, Asheville, N. C., Wiley F. Mitchell, Jr., and James L. Granum, Washington, D. C., and William T. Joyner and Walton K. Joyner, Raleigh, N. C., for defendant.

CRAVEN, Chief Judge.

This is an action brought by the United States at the request of the Interstate Commerce Commission to recover civil penalties for violations of the Safety Appliance Act.[1]

Both plaintiff and defendant have filed motions for summary judgment. The evidentiary facts are not in dispute. Briefly stated,[2] the Southern Railway Company began a program on February 4, 1963, intended to make one railroad car out of what had previously been two conventional hopper cars. The method adopted to accomplish the desired result was simply to join two conventional hopper cars together with the conventional couplings and then to modify the couplings as follows: those parts required to unlock and open the couplers, namely the cut lever, the toggle, the anticreep

---

1.  45 U.S.C.A. §§ 1–16.

2.  Detailed findings of fact are filed separately.

shelves and the rotary lock lifter, were removed; to give further assurance that the two could not be physically separated, a metal rod was then inserted into the mechanism from the top in such fashion as to make the lock completely inoperable and to hold it in a closed or fastened position; this rod was then welded in place. The effect of the modification is that the two previously separate hopper cars became joined together so that they cannot be physically separated without removing the welded rod by use of a cutting torch. When the work had been completed, Southern obliterated the numbers previously appearing on the two separate cars and assigned a single serial number to the resulting combination.

Since February 4, 1963, Southern has performed this operation on 656 conventional hopper cars, resulting in half that number of combined units. Each of the combined units has moved regularly in railroad service without physical separation. One of them, No. 102794, is the subject of Counts 2 and 3 of the complaint.[3] The United States contends that it is actually two single hopper cars joined improperly in violation of the Safety Appliance Act. Southern insists that No. 102794 is a single hopper car consisting of two units articulated by a permanent welded coupling.

The civil penalties sought to be recovered by the United States in this action are of little consequence. But such recovery will have the practical effect of stopping Southern's program of combining hopper cars and separating those that have been joined, which is said to be of tremendous consequence and importance to the Railway. Conversely, the United States is gravely concerned for the safety of railroad employees, and is fearful that Southern's program of combining hopper cars will become industry-wide—to the harm and detriment of railroad employees if in violation of the Safety Appliance Act.

In applying the law to the facts, the Safety Appliance Act should be liberally construed as a safety measure. It is not for the courts to determine in particular cases whether safety requirements contained in the Act are or are not needed. United States v. Seaboard Air Line Railroad Co., 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959). Thus, the question is not whether hazard to employees has been increased or diminished by the combination of two hopper cars, but simply whether the Congress has required that the combination of hopper cars designated 102794 be equipped at the place of connection between the two units with coupling devices capable of operation without the necessity of men going between the combined units forming No. 102794. There is an absolute duty upon Southern Railway to comply with the requirements of the Safety Appliance Act in cases to which those requirements have application, and failure to comply will not be excused by the adoption of equivalents. Louisville and Jeffersonville Bridge Co. v. United States of America, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757 (1919).

The question for decision is simply whether or not the connection between the two units forming Southern No. 102794 is a case to which the following portion of the Safety Appliance Act, 45 U.S.C.A. § 2, has application:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

Is Southern No. 102794 one articulated car or is it two hopper cars joined in violation of the statute? The term "car" is not defined in the above-quoted portion of the statute or elsewhere in the

---

**3.** Defendant concedes liability on Count 1, which liability is not related to the matters in controversy in the other counts.

Safety Appliance Act. What was the evil sought to be remedied by the Congress? As early as 1878, the American Railway Association met to consider means of coupling and uncoupling railroad cars without use of link and pin. In 1890 the National Association of State Railroad Commissioners adopted a resolution requiring cars to be equipped with an automatic coupler. During that year, according to a report of President Harrison to Congress, 369 brakemen were killed and 7,841 were maimed while engaged in coupling cars. Plainly, the purpose of the law was that stated in the Seventh Annual Report of the Interstate Commerce Commission: "In the matter of couplers, the aim of the law is that the men shall not be required to go between cars in order to couple or uncouple * * *."

There is no necessity for men going between the combined units forming Southern car No. 102794. The units are combined "permanently" and are not intended to be separated. Nor can they be separated without the use of a cutting torch. The Congress has neither defined "car" nor specified the design of coupling devices. The railroads are still free to design and operate such cars and connecting mechanisms as may best serve their commercial purposes—provided only that such units do not violate the Safety Appliance Act. Johnson v. Southern Pacific, 196 U.S. 1, 25 S.Ct. 158, 49 L.Ed. 363 (1904).

Pennell v. Philadelphia & Reading Railway Co., 231 U.S. 675, 34 S.Ct. 220, 58 L.Ed. 430, 431 (1914), supports the defendant's contention that Southern 102794 is one car. The question before the Supreme Court was remarkably similar: "Is the tender of the locomotive a car within the meaning of the statute?" It was held that engine and tender are a single thing; "(S)eparable, it may be, but never separated in their ordinary and essential use." Therefore, the failure of the defendant to have an automatic coupling device between engine and tender was not considered to be in violation of the Safety Appliance Act.

Southern 102794 is *one* car within the meaning of the statute. To hold it is *two* cars is to ignore the purpose of the statute: to prevent injury to those engaged in coupling and uncoupling. No. 102794 has become a single thing—separable maybe—but never separated in ordinary use. Defendant's hauling of No. 102794 did not violate the Safety Appliance Act. Pennell v. Philadelphia & Reading Railway Co., supra; United States v. International Great Northern Railway, D.C., 9 F.2d 142; International Railway v. United States, 2 Cir., 238 F. 317; Wabash Railroad Co. v. United States, 7 Cir., 172 F. 864.

Counsel may submit an appropriate judgment.