**UNITED STATES of America,**
**Plaintiff,**

v.

**The CHESAPEAKE AND OHIO RAIL-**
**WAY COMPANY, Defendant.**

**Civ. A. No. 2999.**

United States District Court
S. D. West Virginia,
Charleston Division.

Feb. 10, 1965.

George D. Beter, Acting U. S. Atty.,
Charleston, W. Va., for plaintiff.

Amos A. Bolen, Huntington, W. Va.,
for defendant.

FIELD, Chief Judge.

The Fourth Count of the amended complaint in this case charges the defendant with a violation of Sections 1 to 10 of Title 45 of the United States Code in the operation of a locomotive and seven cars over 1.6 miles of track in the Peach Creek Yard near Logan, West Virginia, on September 25, 1963. Defendant admits that the brakes on each of the cars were not connected nor operable by the engineer, but contends that this was a switching operation and not a train movement within the meaning of the Safety Appliance Act.

The facts, largely undisputed, may be stated briefly as follows: On the date in question Locomotive No. C. & O. 6707, a yard engine, proceeded to some industrial sidings east of Peach Creek Yard, and began working its way back to the yard, picking up empty cars along the way. When it reached the yard, it had two cabooses and five empty cars, including a "bad order" cinder car.

At the yard, the locomotive maneuvered over a "wye" track and coupled into the lead position heading west on track 10, followed by the two cabooses and five empty cars. It then proceeded pursuant to orders of the yardmaster along track 10 past the "empty yard," a series of cross-over switches and the "load yard" to a point a short distance west of mile-post 63. It then backed into "short 15" track where it left the five empty cars, and thereafter proceeded back to the east to place the two cabooses on the District Caboose track.

The distance from the "wye" track to "short 15" is 1.6 miles and the locomotive travelled at approximately eight miles per hour between those two points. In that distance it was necessary to stop on two occasions to line up switches. The operation was conducted in the daylight hours, between 5:41 and 5:55 P.M. Eastern Standard Time.

The Peach Creek Yard is a cohesive area located entirely on property of the defendant, and is utilized for classification and storage of cars. Yard operations such as the one here in question are carried on exclusively by yard crews. Empty coal trains are brought in from Barboursville and placed in the "empty track" area in the easterly end of the yard. From there they are channelled out to the mines in the Logan field. Loaded cars are brought in and placed in the "loaded track area" in the westerly end of the yard where they are assembled into trains for movement down to Barboursville and the C. & O. main line. No unit or "through" trains pass through the Peach Creek yards and passenger service was abandoned many years ago. No public or private roads or highways cross any of the tracks in the yard area, nor is the yard traversed by the tracks of any other carrier.

### Conclusions of Law

It would serve no useful purpose to review the welter of cases on this subject, for in the light of these facts I agree with counsel for defendant that the application of the principles set forth in United States v. Seaboard Air Line R. Co. (1959) 361 U.S. 78, 80 S.Ct. 12, 4 L.Ed.2d 25, clearly demonstrates that the instant case involves a "switching operation" rather than a "train movement." This operation was one involving "a sorting, or selecting, or classifying" of cars, and was not a movement "where the traffic was exposed to the hazards against which the Act was designed to afford protection." In the Seaboard case, a substantial number of cars were being received from consignors or delivered to consignees, and the movement involved crossing streets and highways at grade as well as tracks of other carriers. In its opinion, the Court stated:

" * * * Traditionally, movements of assembled cars for substantial distances involved the hazards of crossing public highways and the tracks of other lines with attendant risks to the public. More important,

they involved risks to those who ride the trains, particularly the men who operate them. * * * Movements which, though miniature when compared with main-line hauls, have the characteristics of the customary 'train' movement and its attendant risks are to be included."

The operation in this case had none of these "characteristics of the customary 'train' movement," and accordingly did not constitute a violation of the Act. Judgment should be entered in favor of the defendant on the Fourth Count.