**UNITED STATES of America,
Plaintiff,
and**
**Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania, Intervening Plaintiff,**

v.

**The MONONGAHELA CONNECTING RAILROAD COMPANY, Defendant.**

**Civ. A. No. 67–1112.**

United States District Court,
W. D. Pennsylvania.

Dec. 6, 1972.

Richard L. Thornburgh, U. S. Atty., for plaintiff.

T. P. Shearer, Pittsburgh, Pa., for defendant.

## OPINION

DUMBAULD, District Judge.

This case originated when the United States on September 18, 1967, filed a complaint seeking a penalty of $250 [1] for movement by defendant of a twelve car train on August 3, 1967, with air brakes operational on only five cars. This was less than 85 per cent of the cars, and hence allegedly violated 45 U.S.C. §§ 1–10, and a regulation of the Federal Railroad Administration (49 C.F.R. 232.1).[2] It should be noted that 45 U.S.C. § 9 requires that not less than 50 per cent of the cars in a train have operational brakes,[3] but that the Secretary of Transportation[4] may *increase* the minimum percentage. Needless to say increase does not mean decrease. It is further provided by 45 U.S.C. § 10 that nothing in section 9 shall relieve anyone from the provisions of sections 1 to 7, which shall all remain applicable except as specifically amended by section 9.

The railroad, and the intervening union, were before this Court in a related matter in Monongahela Connecting R. R. Co. v. Pa. P.U.C., 253 F.Supp. 50 (W.D. Pa.1966); rev'd in part 373 F.2d 142 (C.A.3, 1967). We there held that the so-called "Talbot movement" (involved in the instant case)[5] was a "true switching movement" and not a "train", and hence under United States v. Seaboard Air Line R. R. Co., 361 U.S. 78, 80, 82, 80 S.Ct. 12, 4 L.Ed.2d 25 (1959), was not subject to the airbrake requirements. The Court of Appeals, however, held that "we are convinced that the Talbot movement is a true train movement and subject to the provisions of the Safety Appliance Act . . . The part of Talbot which has to do with the assembling of hopper cars on the north side of the river constitutes a switching type of collecting cars. But once the cars are brought together and the movement starts its journey across tracks utilized by other movements, and finally across the Monongahela River, . . .

1. 45 U.S.C. § 6.

2. 49 C.F.R. 232.1 provides: "On and after September 1, 1910, on all railroads used in interstate commerce, whenever, as required by the Safety Appliance Act as amended March 2, 1903, any train is operated with power or train brakes, not less than 85 per cent of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-brake cars in every such train which are associated together with the 85 per cent shall have their brakes so used and operated."

3. 45 U.S.C. § 9 provides, in pertinent part: Whenever, as provided in sections 1 to 7 of this title, any train is operated with power or train brakes not less than 50 per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power braked cars in such train which are associated together with said 50 per centum shall have their brakes so used and operated; and, to more fully carry into effect the objects of said sections, the Secretary of Transportation may, from time to time, after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train brakes which must have their brakes used and operated as aforesaid.

4. The Act of Oct. 15, 1966, 80 Stat. 937, 49 U.S.C. § 1655(e)(1)(B), transferred to the Secretary the functions of the Interstate Commerce Commission under the Act of March 2, 1893, and of March 2, 1903, as amended. Sections 1–7 of 49 U.S.C. are derived from the Act of 1893, *sections 8–10 from the Act of 1903.*

5. More specifically, the movement involved in the present case is of empty cars moving northbound, whereas the prior case involved the southbound movement of loaded cars. The *simultaneous transportation* of assembled cars as a unit over the tracks and across the bridge is the same, however, in both cases. The line-haul movement of assembled cars is about 4000 feet (Tr. 26).

it takes on every characteristic of a train movement. . . . [The] Talbot movement, as at present constituted, is a train movement and subject to the authority of the said Federal Safety Appliance Act." (373 F.2d at 149).

Meanwhile, on November 7, 1972, the Government moved to dismiss its complaint for the reason that "the facts do not support the entry of a judgment in favor of the United States." The union opposes dismissal. Whether or not the union has standing, its contentions, if found convincing by the Court, should affect the Court's exercise of discretion with respect to approving dismissal of the case. Only $250 is involved, but all parties regard the issue as important, as a precedent, because similar daily movements either do or do not violate the Safety Appliance laws.

While the case was pending, the Railroad applied to the Department of Transportation for "exemption" from the requirements of these laws. The agency on August 2, 1972, held a hearing in Pittsburgh [6] and on October 24, 1972, its Railroad Safety Board concluded that it was hazardous to trainmen to connect the air hoses above material bins on a grating, and that the locomotive brake with 50 pounds air pressure per square inch, at 8 miles per hour, would provide ample braking for loads of 600 tons or less; for heavier loads two locomotive units should be used.

The question is, does the Transportation Department have legal authority to grant exemptions from requirements imposed by Acts of Congress?

To ask this question, as Chief Justice White used to say, is to answer it.[7] Of course there is no "dispensing power"[8] in an executive or administrative agency unless Congress has specifically granted it. When Congress has chosen to do so, it indicates its intention clearly and in express terms, as with respect to the application of the antitrust laws to railroad activities. 49 U.S.C. § 5 and 5a; McLean Trucking Co. v. United States, 321 U.S. 67, 83–87, 64 S.Ct. 370, 88 L. Ed. 544 (1944); Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 396, 60 S.Ct. 907, 84 L.Ed. 1263 (1940); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225–227, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). It has not done so here.

■ The power to "exempt" relied upon by the railroad here in 49 C.F.R. 211.11 extends only to the "rules" prescribed by the agency itself.[9] The agency can validly, as it has done, under 45 U.S.C. § 9 increase the percentage of cars with operative brakes from 50 per cent to 85 per cent; and could exempt a carrier from the 85 per cent requirement. But thereupon the statutory 50 per cent requirement would come into play automatically. By repealing the administrative increase the agency can not eliminate the statutory minimum.

■ Nor may this Court substitute its judgment for that of Congress in determining what method of railroad operation is safe or unsafe. We are admonished by the Supreme Court in the Seaboard case, supra, that "it is not for the courts to determine in particular cases whether this safety measure is or is not

6. The hearing was handled as "non-adversary" with no cross examination of persons presenting statements.

7. For comment on White's frequent use of this phrase see Frankfurter, "Reflections on Reading Statutes," in Alan F. Westin, An Autobiography of the Supreme Court (1963) 308. See also Goesaert v. Cleary, 335 U.S. 464, 465, 69 S. Ct. 198, 93 L.Ed. 163 (1948).

8. The lack of such power was anciently established as part of the English Bill of Rights of 1689, after attempted exer-

cise of such power by James II led to his abdication. Dumbauld, The Constitution of the United States (1964) 7, 12.

9. C.F.R. 211.11 provides that "Any person may petition the Administration to issue, amend, or repeal a rule, or for a permanent or temporary exemption from any rule." Similarly, 45 U.S.C. § 431(c) authorizes waiver of rules made under 431(a), which are to be merely supplementary to, and not to supplant, provisions of law in effect on October 16, 1970.

needed. Congress determined the policy that governs us in applying the law." 361 U.S. at 82, 80 S.Ct. at 15.

■ What, then, is the conclusion of the matter? It appears that there is an important question of public interest relating to separation of powers and the scope of executive or administrative authority which is presented by the case at bar. *Prima facie* the United States Attorney's motion is unfounded when it says that "the facts do not support the entry of a judgment in favor of the United States." On the contrary, it would seem that the Government would clearly win, and that the defendant might prudently pay the $250.

However, this is an old case, instituted in 1967, and according to prevailing statistical standards of judicial administration any case over three years old is an old case and adds to the unpalatable "backlog" which gives the news media which cover the court system something to talk about which does not overtax a layman's powers of legal analysis.[10]

Therefore, if at all consistent with our sense of duty, this Court should not discourage any effort to put an end to this stale litigation.

This conclusion is reinforced by our belief that the situation is in fact not hazardous to the actual safety of the railroad employees. On its merits (which are not for us to judge) it would seem that the agency's determination *(obiter dictum, brutum fulmen,* or *ultra vires* though it be)· is supported by scientific tests and by common sense. Hence no strong public interest forbids relegation of the parties to another remedy, if such be available.

We think there are such remedies. Since this pattern of operation is a recurrent one, a new case on the same facts can be instituted at any time; and it is at least arguable that under 45 U.

S.C. § 6 the United States Attorney is duty bound "to bring such suits upon duly verified information being lodged with him of such violation having occurred."

■ In the second place, we believe the intervening union is entitled to seek judicial review in a three-judge court of the agency's ruling of October 24, 1972. 49 U.S.C. § 1653(c) provides that actions of the Department of Transportation shall be judicially reviewable "in the same manner as if such . . . actions had been by the . . . agency [here the I.C.C.] exercising such functions . . . immediately preceding their transfer." Review of I.C.C. orders under 28 U.S.C. § 2325 by a three judge court is a familiar feature of the federal judicial system. Under existing law, there is no specified time limit within which such actions must be brought.[11] Lack of statutory authority to take the action assailed has always been a valid ground for setting aside Commission action. I. C. C. v. Union Pacific R. R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308 (1912).

*Accordingly, we grant the motion to dismiss.*

## ORDER

And now, this 6th day of December, 1972, after argument, for the reasons set forth in the foregoing opinion,

It is ordered that said motion by plaintiff to dismiss be and the same hereby is granted, and the above-styled action be and it hereby is dismissed; provided, however, that intervening union may petition the Court for reinstatement if (1) union within 90 days brings an action in a three judge court for review of the agency's action and said review is denied for lack of standing or as untimely or otherwise without determination on the merits and (2) thereafter upon presentation of duly verified infor-

---

10. Some writers, however, are coming to recognize that justice delayed is often preferable to instant injustice.

11. There is legislation pending which might impose such a time limit. See Pittsburgh & New England Trucking Co. v. United States, 345 F.Supp. 743, 746, note 1 (W.D.Pa.1972).

mation to the United States Attorney regarding an identical current incident he shall have failed to file suit for collection of penalty within 30 days of the lodging of such information.