UNITED STATES of America et al.,
Plaintiffs,

v.

CHESAPEAKE AND OHIO RAILWAY
COMPANY, Defendant.

Civ. No. 73 F 28.

United States District Court,
N. D. Indiana,
Fort Wayne Division.

May 29, 1975.

John R. Wilks, U. S. Atty., Stephen D. Long and Hugh Kennerk, Max E. Hobbs, Fort Wayne, Ind., Lester Schoene and Lawrence M. Mann, Washington, D. C., Harold A. Ross, Cleveland, Ohio, for plaintiffs.

William E. Borror, Fort Wayne, Ind., Robert O. Smith, Jr., Baltimore, Md., for defendant.

## MEMORANDUM OF DECISION AND JUDGMENT

ESCHBACH, Chief Judge.

This action was brought by the Government to recover statutory penalties for alleged violations by the defendant of the Hours of Service Act, 45 U.S.C.A. §§ 61–64, in keeping railroad employees on duty in excess of the statutory maximum hours. The court granted motions to intervene as plaintiffs filed by the United Transportation Union and the Brotherhood of Locomotive Engineers. This cause is now before the court on cross-motions for summary judgment, accompanied by stipulations of fact signed by all the parties. For the reasons set forth below, summary judgment will be entered in favor of the plaintiff United States and against defendant.

This cause of action arises under 45 U.S.C.A. § 64a(a), which authorizes suit to be brought by the United States Attorney to recover penalties for violation of the Act in the United States District Court having jurisdiction in the locality where the alleged violation occurred.

The factual circumstances forming the basis of this lawsuit have been stipulated by the parties. Defendant Chesapeake and Ohio Railway (C&O) is a common carrier engaged in interstate commerce. This controversy involves the hours of service of the crew of C&O train "Extra 4817 West" on March 12 and 13, 1971. The six-man crew went on duty at Stevens, Kentucky, at 7:00 p.m. on March 12. After leaving Stevens, Kentucky, the train traveled over tracks owned and operated by C&O until it reached Cincinnati, Ohio. From Cincinnati, Ohio, to Cottage Grove, Indiana, the train traveled over tracks owned and operated by the Baltimore and Ohio Railroad Company (B&O). From Cottage Grove, Indiana, the train continued westward over C&O tracks to Sweetser, Indiana, where the six-man crew was relieved by another crew at 12:59 p.m. on March 13, 1971. If a violation of the Hours of Service Act occurred, the Government contends it occurred at Sweetser, located in the Northern District of Indiana.

On the night of March 12–13, Extra 4817 West made a stop at Hamilton, Ohio, located between Cincinnati, Ohio, and Cottage Grove, Indiana, on the B&O tracks. The train arrived at Hamilton at approximately 10:00 p.m. on March 12. While in Hamilton, the crew received an interim period available for rest lasting four hours, from 2:00 a.m. to 6:00 a.m. on March 13. At 2:00 a.m., they were placed in a taxicab and taken to a motel, arriving at approximately 2:30 a.m. After eating, the employees went to sleep until they were contacted by a railroad official at 5:00 a.m. and instructed to return to duty at 6:00 a.m. The train then departed from Hamilton at approximately 7:00 a.m.

The controversy centers on the nature of this rest period given the crew of Extra 4817 West. If the rest period counts as time on duty, the crew would have been on duty a total of 17 hours and 59 minutes on March 12–13 until relieved at Sweetser, Indiana. In 1971, the statutory maximum contained in 45 U.S.C.A. § 62 was fourteen (14) hours. The penalty for each violation of the Act is $500, 45 U.S.C.A. § 64a, and the Government seeks to recover $3,000, $500 for each of the six crewmen involved. If, however, the rest period at Hamilton is excluded from time on duty, the employees would have been on duty only 13

hours and 59 minutes, and no violation would have occurred.

Time on duty is defined in 45 U.S.C. A. § 61(b)(3), which provides in pertinent part:

Time on duty shall commence when an employee reports for duty and terminate when the employee is finally released from duty, and shall include:

(A) Interim periods available for rest at other than a designated terminal;

(B) Interim periods available for less than four hours rest at a designated terminal . . . .

The precise issue in this case, therefore, is whether Hamilton, Ohio is "a designated terminal" within the meaning of the Hours of Service Act. If it is, the rest period there would be excluded from time on duty because the interim period met the four-hour requirement.

The Government and the two intervening unions argue that Hamilton is not a designated terminal within the meaning of the Act. They contend that "designated terminal" means only the home terminal or the away-from-home terminal assigned by the employing railroad company to each railroad employee or train crew. In the present case, Stevens, Kentucky, was the crew's specified away-from-home terminal and Peru, Indiana, the crew's home terminal. When the crew was relieved at Sweetser, Indiana, they were "deadheaded" to Peru, Indiana, their home terminal, where they were finally released from duty. (Time spent in deadhead transportation is counted as neither time on duty nor time off duty, and is not relevant to the issue in this case.) Plaintiffs contend that the only terminals which would qualify as "designated terminals" for this crew would be Stevens, Kentucky, and Peru, Indiana.

Defendant, on the other hand, argues that any place with suitable facilities for food and lodging meets the requirements of "designated terminal" within the meaning of the Act and that Hamilton was such a terminal. The parties have stipulated that Hamilton did have suitable facilities for food and lodging. Moreover, defendant contends that Hamilton was a home and an away-from-home terminal for some B&O crews. It was not a terminal for any C&O crews, however, and it is located on tracks owned and operated by B&O. The parties have stipulated that C&O controls the B&O Company through its ownership of approximately 95% of the common and preferred stock of B&O. Although the companies are closely affiliated, B&O has retained its separate corporate existence. Pursuant to a trackage agreement between C&O and B&O, C&O began operations over the B&O tracks through Hamilton in June 1968.

The Hours of Service Act, originally enacted in 1907, was amended in 1969, and the language defining time on duty was added at that time. The major purpose behind the 1969 amendments was to shorten the maximum hours of continuous on-duty time from sixteen hours to fourteen hours and then, after a two-year period, to twelve hours. *Senate Report No. 91–604*, 91st Cong., 1st Sess., 1969 *U.S.Code Cong. and Admin.News*, pp. 1636, 1638–1640. In addition, through the definition of time on duty, Congress enacted the provision on rest periods, modifying a policy which had developed under the 1907 statute relating to interim rest periods and the length of time required in order to interrupt what would otherwise be regarded as continuous time on duty. Before the 1969 amendments, the Interstate Commerce Commission and the courts had evolved a rule of thumb that a rest period of at least three hours at a place with suitable facilities for food and lodging would be adequate to constitute an interruption of duty and would not count as time on duty. *United States v. Atchison, Topeka & Santa Fe Railway Company*, 363 F.Supp. 644 (N.D.Cal. 1973). The parties in the present case agree that prior to 1969, the circumstances of this case would not have resulted in a violation of the Act. Through the 1969 amendments defining

time on duty, however, Congress lengthened any interim rest period excludable from time on duty to four hours and attempted through the term "a designated terminal" to place a limit on where such excludable rest periods could be taken. The Senate Commerce Committee, in reporting on the 1969 amendments, offered the following interpretation of "designated terminal":

> The phrase "designated terminals" in section 1(b)(3)(A) and (B) is intended to have that meaning commonly recognized in the railroad industry. The committee is advised that collective bargaining agreements provide a commonly understood definition for this term. As a minimum the committee intends that the term should mean generally a place where suitable food and lodging are available for employees. *(S.Rep.No. 91–604,* 91st Cong., 1st Sess., 1969 *U.S.Code Cong. and Admin.News* at, p. 1640.

All parties in the present action find support for their positions in this rather ambiguous language on legislative intent.

The same issue involving the interpretation of the phrase "designated terminal" was before the court in *United States v. Atchison, Topeka & Santa Fe Railway Company,* 363 F.Supp. 644 (N. D.Cal.1973), the only case brought to this court's attention dealing with the 1969 amendments to the Hours of Service Act. After reviewing the legislative history of the amendments, the court concluded that there was no commonly recognized meaning of the phrase "designated terminal" in the railroad industry, contrary to the assertion of the Senate Commerce Committee in *S.Rep. 91– 604* as quoted above. The court did not proceed to define "designated terminal," but held that the Government had *not* proved that Stockton, California, where the contested rest period occurred, was *not* a designated terminal. The court found that Stockton was clearly a railroad terminal, although it is not clear from the opinion whether Stockton was a home or away-from-home terminal for any of the defendant's crews or employees. Stockton was not the home or away-from-home terminal for any of the employees involved in that action. The court found for the defendant railroad on summary judgment, and defendant in the action presently before this court argues that the California case should be followed.

[1, 2] Defendant contends in its brief that "designated terminal" is any point on a railroad which is "designated" by railroad management as a release point and which has suitable facilities for food and lodging. Defendant in effect is contending that the statutory language in question enacts the previous rule of thumb on what constitutes an interruption of continuous duty except that the required time period has been lengthened to four hours. Clearly, the term "designated terminal" means more than any place with suitable facilities chosen by management. During the hearings on the 1969 amendments, the Association of American Railroads, representing management, proposed an amendment to substitute the phrase "place where reasonable facilities for food and rest are available to employees" for the phrase "designated terminal." *Hearings on S. 1938 Before the Subcommittee on Surface Transportation of the Senate Committee on Commerce,* 91st Cong., 1st Sess. at 153 (1969), excerpt attached as exhibit 1 to plaintiff United States' motion for summary judgment. Defendant seeks to have the present statutory language interpreted as identical to this proposed amendment. If defendant's construction of the word "designated" were adopted, railroad management would be free to unilaterally choose any point on a railroad line that had a motel and restaurant and in that way avoid the penalties of the Act. Although the court may agree with defendant that any place with suitable facilities may satisfy the

safety rationale behind the statute, this court is not free to substitute its own ideas on safety requirements for those enacted by the legislature. *United States v. Seaboard Air Line Railroad Company,* 361 U.S. 78, 82, 80 S.Ct. 12, 15, 4 L.Ed.2d 25 (1959). The phrase "designated terminal" clearly requires that the rest period occur at a railroad terminal regardless of the significance attached to the word "designated." The court therefore rejects the interpretation of the phrase urged by defendant.

■ Based on the facts submitted to this court regarding Hamilton, Ohio, and its lack of status as a railroad terminal on the C&O line, this court finds that Hamilton is not "a designated terminal" within the meaning of the Act. Although this court agrees with the legislative history of the 1969 amendments to the Act as set forth in the opinion in *United States v. Atchison, Topeka & Santa Fe,* 363 F.Supp. 644, *supra,* this court disagrees with the conclusion that the collective bargaining agreements in the industry do not provide a common basis for interpretation of the phrase "designated terminal." The Government and plaintiff intervenors have attached numerous exhibits to their briefs on summary judgment containing excerpts from the testimony before congressional committees on the 1969 amendments and excerpts from railroad collective bargaining agreements. After review of these exhibits and the briefs on the motions before the court, the court finds that there are two types of terminals commonly referred to in the industry— home terminals and away-from-home terminals. The parties have stipulated that the collective bargaining agreements between C&O and each of the labor organizations representing C&O employees who operate trains, as well as other collective bargaining agreements, contain references to "designated home terminal" and "away-from-home terminal."

The process of assigning home and away-from-home terminals to specified train runs and crews appears to be of crucial significance to both management and labor in the railroad industry. Each crew or employee is assigned a home terminal and, in most cases, an away-from-home terminal. These assignments generally serve as the boundaries of the area within which the crew operates. Terminal assignments under certain circumstances appear to govern the rate of pay and amount of time earned by crews, especially in the computation of "held away from home" time and the computation of food and lodging allowances. The collective bargaining agreements attached as exhibits by plaintiffs generally provide that established terminals may not be changed or new terminals created without agreement between the railroad management and the labor organization involved. Plaintiff intervenor Brotherhood of Locomotive Engineers has attached the agreement between C&O and the union which established Stevens, Kentucky, as the away-from-home terminal for certain C&O crews, including the one involved in the present controversy. Establishment of home and away-from-home terminals is of vital importance to both labor and management, and much of the discussion before congressional committees on the 1969 amendments focused on the impact of those amendments, particularly the hour limitations, the spacing of terminals, the length of runs between terminals, and the possibility of more frequent layovers by employees at their away-from-home terminals.

■ It is true, as the court found in *United States v. Atchison, Topeka & Santa Fe, supra,* that the exact phrase "designated terminal" does not appear with any regularity in collective bargaining agreements, and, when it is used, it refers only to the classification of a terminal as home or away-from-home for a particular railroad division or run. Al-

though the exact phrase is not commonly used, the process of "designating" a terminal as home or away-from-home is referred to with great regularity in the agreements. It appears reasonable to this court to assume that by use of the word "designated" Congress chose a term that would include both home and away-from-home terminals, and was referring to the process by which such terminals were assigned to train runs and/or crews. Realizing the significance of home and away-from-home terminal designations, it would be reasonable for Congress to make use of such specifications in order to place a limit on where employees could be given rest periods. In using the term "designated terminal" as referring to home and away-from-home terminals, the legislature was seeking to insure that the rest period location would have the minimal facilities for food and lodging generally found at such terminals. Home and away-from-home terminals are regularly designated for purposes entirely distinct from choosing points for interim rest periods. Thus, the statute relies on a process of designation which occurs regularly in the normal course of railroad operation and collective bargaining between railroad management and labor. Under this analysis, the phrase "designated terminal" in 45 U.S.C.A. § 61(b)(3) refers to and includes all stations or points on the railroad line in question which have been established in collective bargaining agreements or otherwise recognized by both management and labor as home and/or away-from-home terminals for that railroad.

 Hamilton, Ohio, was not a home or away-from-home terminal on the C&O line. The fact that it may have been such a terminal on the B&O line is not relevant to this case. A designated terminal on one railroad line does not become a designated terminal for every other railroad line that may pass through that station or stopping point. The terminal which meets the requirements of 45 U.S.C.A. § 61(b)(3) must at least be a home or away-from-home terminal for the railroad company for which the employee works.[1] Otherwise, there would be little, if any, certainty among the employees as to where they may be required to "tie up" for an interim rest period.

The question which this court need not decide in the present case is whether "a designated terminal" in § 61(b)(3) means the particular home or away-from-home terminal for the individual employee involved or whether it means any home or away-from-home terminal on the railroad employer's line. Plaintiffs in this case argue that the phrase should be interpreted as referring only to the home or away-from-home terminal of each employee. In other words, the Government and unions would interpret the statute as providing that only interim rest periods of at least four hours at the employee's own home or away-from-home terminal would be excluded from time on duty. A less restrictive interpretation is possible by reading the phrase "a designated terminal" (emphasis added) as including all home and away-from-home terminals on the company's line. In construing the phrase "a terminal" in another section of the Act, 45 U.S.C.A. § 64a(d), the Supreme Court interpreted it as including any point on the railroad line "known and

---

1. This opinion is not intended to imply that one railroad cannot establish designated terminals for its employees on tracks owned and operated by another railroad company. If in fact Hamilton, Ohio, had been a home or away-from-home terminal for any C&O employees, although located on B&O tracks, it would qualify as a designated terminal under this court's interpretation of the Act. However, it should be clear from this interpretation that a designated terminal for one railroad company's employees does not become a designated terminal for another railroad company's employees.

designated as a division terminal," not just the particular crew's own home and away-from-home terminal. *Atchison, Topeka & Santa Fe Railway Company v. United States,* 244 U.S. 336, 340–343, 37 S.Ct. 635, 637–638, 61 L.Ed. 1175 (1917). The plaintiffs rely on certain language in *United States v. Atchison, Topeka & Santa Fe Railway Company,* 212 F. 1000 (D.Ariz.1914), to support their contention that the phrase means only the crew's own terminals. In that case, the district court found that "terminal" referred only to the home and away-from-home terminal of the crew involved, but the result in that case was overruled by the Supreme Court's later interpretation in *Atchison, Topeka & Santa Fe,* 244 U. S. 336, 37 S.Ct. 635, 61 L.Ed. 1175, *supra.* In any event, this issue need not be resolved in order to find that Hamilton, Ohio, was not a designated terminal within the meaning of the Act. Because it was not such a terminal, the rest period there is included as time on duty, and the six-man crew of Extra 4817 West was on duty for over fourteen hours on March 12 and 13, 1971, violating 45 U. S.C.A. § 62(a).

## JUDGMENT

Accordingly, because there exists no genuine issue of material fact and because plaintiff United States is entitled to judgment as a matter of law, plaintiff United States' motion for summary judgment is hereby granted, and defendant Chesapeake and Ohio Railway Company's motion for summary judgment is hereby denied. Defendant is directed to pay three thousand dollars ($3,000) to plaintiff United States, consisting of five hundred dollars ($500) for six violations of the Hours of Service Act, as provided for in 45 U.S.C.A. § 64a(a). The clerk of this court is directed to enter judgment in favor of plaintiff United States on its complaint and against defendant Chesapeake and Ohio Railway Company.